**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**1:20-cv-05458** (LTS)(SDA)

**Steven E. Greer**

Plaintiff;

v.

**Tucker Carlson,**
**Fox Corporation,**
**Fox News Media,**
**Fox News Network LLC,**
**Lachlan Murdoch,**
**Suzanne Scott,**
**Justin Wells,**
**Blake Neff,**
**Charles Gasparino,**
**Fox Business Network,**
**Brian Jones,** and

---

**News Corporation,**
**Dow Jones,**
**The Wall Street Journal,**
**Gerard Baker,**
**Jennifer Strasburg,** and

---

Defendants.

**COMPLAINT** FOR:

**1- Unfair Competition** by misappropriation– (common law)

**2- Misappropriation of "hot news"**- (common law)

**3- Unjust Enrichment**- (common law)

**4- "Blacklisting"-** i.e. Tortious Interference with Contractual Relations, and Tortious Interference with Prospective Economic Advantage, (both common law), and Injury to Business Reputation (NY Gen Bus L §360-L (2012)

**5- Defamation**- (common law)

**6- Intentional Infliction of Emotional Distress**- (common law)

Plaintiff Steven E. Greer ("Greer" or "Plaintiff") hereby complains and alleges as follows:

## NATURE of the CASE

1. Greer is the victim of unfair competition, and misappropriation of "hot news" as Defendants used Greer's original and unique writings for their own television show content, without permission and without giving recognition to Greer as the originator.

2. Plaintiff is the victim of unjust enrichment from the use of his creative content by Defendants.

3. Plaintiff Steven E. Greer, MD is the victim of a conspiracy by Defendants to "blacklist" him from appearing on national media platforms, including television and radio.

4. Dr. Greer is the victim of defamation. In the course of carrying out the blacklisting, Defendants committed defamation.

5. Plaintiff is also the victim of intentional infliction of emotional distress when Defendants engaged in the blacklisting as well as abused their power to falsely engage the ominous power of the FBI by misleading the agency into investigating Greer when there was no cause whatsoever to do so.

# THE PARTIES

## Steven E. Greer, MD

6. Plaintiff Steven E. Greer, MD is a citizen of the United States of America currently living in Florida. He is a medical doctor, professional investor, and journalist.

7. Greer is also an experienced federal litigator, having won motions in courts ranging from the district court level up to the Supreme Court of the United States. He orchestrated a settlement for a large sum of money in district court while the other defendants were ousted from their positions in New York government. In the Supreme Court, Greer successfully had the opposing counsel removed and his *writ certiorari* went unopposed.[1]

8. In addition, Plaintiff was forced to handle *pro se* an automobile consumer transaction lawsuit in Ohio State Court when his lawyer became a disbarred convicted felon, possibly related to substance abuse matters. His efforts led to a successful appeal in the Ninth District. Plaintiff won on three of the five assignments of error, with one becoming moot by the other reversals.

9. Plaintiff's political views are centrist, best described as "populist". He has disdain for both the old Democrat and Republican parties and believes that the nation is now suffering from corruption in all aspects of government because of those parties. Greer supports President Trump who rose to power by appealing to populism.

10. As a professional writer and medical doctor, Dr. Greer also became in the year 2000 a Wall Street financial analyst for the investment bank of Donaldson Lufkin & Jenrette. Then, after a corporate merger, he worked for Credit Suisse, having survived the culling of redundant staff. He then became a partner at a large hedge fund. He eventually became a

[1] In *Greer v Mehiel* 19-1262, SCOTUS, Greer learned that the opposing counsel duplicitously obtained an order (extending more time for them to file their opposition) by failing to ever serve him the motion. He tried to vacate the order while also lodging a complaint with the court. The result was the opposing counsel abandoning the efforts to extend time while also being removed from the case entirely. Therefore, the *writ certiorari* proceeded as originally scheduled. The writ was ultimately not accepted by the court, not surprisingly. However, no writs were accepted on merit from that session, perhaps due to illness by Chief Justice Roberts, *pro se* bias by the courts, other matters related to the coronavirus upheaval of the courts, or mere statistical odds.

portfolio manager for the healthcare sector at Merrill Lynch managing $250 Million of the $10 Billion internal hedge fund assets. He outperformed his peers in the market.

11. Dr. Greer became a credible expert with unique experience in two fields. He was highly sought after by national media outlets as a television guest to discuss Wall Street and medicine.

12. This led to him founding The Healthcare Channel in 2006. At a time when YouTube was first becoming established, The Healthcare Channel was the first ever Internet-based video portal for Wall Street medical investors and healthcare professionals. The Healthcare Channel partnered with Thomson Reuters in 2008 and The University of Miami medical system in 2010, whereby Greer was paid to create video interviews and expert discussion panels. Large financial institutions also purchased $10,000 subscriptions for access to the content. Healthcare Channel subscribers represented more than $4 Trillion in assets under management.

13. Around this same time, Greer began doing interviews for cable television business networks, such as CNBC and the Fox Business Network. In 2007, Brian Jones of Fox Business saw Greer on CNBC and recruited him to be their star guest, appearing at 7:00 AM as the leading guest dozens of times over several years. He was their primary source for healthcare topics. In October of 2008, Fox Business made Greer a written offer of employment as a contributor, which he declined (Ex. A).

14. Greer also became an unpaid contracted freelance writer for The Wall Street Journal ("WSJ"), which is owned by the News Corp and Dow Jones defendants (Ex. B). Several of his opinion pieces and letters led to major changes at the center for Medicare and Medicaid services or CMS.[2]

15. Having been mostly out of the national television scene for a decade due to the blacklisting alleged in this complaint, Dr. Greer became in March of 2020 the leading voice in the New York radio market on topics related to the Wuhan virus pandemic. His interviews with

[2] "CMMI Director Leaves After Healthcare Channel Investigates" The Healthcare Channel. September 29, 2013. https://thehcc.tv/2019/10/01/cmmi-director-leaves-after-healthcare-channel-investigates/

Joe Piscopo on radio station AM 970 (Ex. C) were the first of their kind to predict important events and received high praise from listeners. This led to a competing New York radio station, WABC (770 AM), recruiting him to be a guest on their radio shows as well (Ex. D).

16. Rudy Giuliani, the former U.S. Attorney, former New York City, and current personal lawyer to President Trump, also invited Dr. Greer's to be interviewed in his 77 WABC radio show and then invited him to be a guest on his video podcast as well.

## **Tucker Carlson**

17. Tucker Swanson McNear Carlson (also referred to as "The Serial Plagiarist" by Plaintiff) was born in San Diego, California on May 16, 1969 (age 51). He is the show-runner and host for his television show on Fox News called *Tucker Carlson Tonight*. He is a U.S. citizen with several homes.

18. He primarily lives with his wife and children in Washington, DC, to the best of Plaintiff's knowledge. His current address is actually unknown because he has moved, presumably, to avoid rioters who were visiting his house. Carlson placed his new residence in a shell company trust and the address is not made public. Until 2018, Carlson lived in Northwest Washington, D.C., which, coincidentally, was adjacent to Greer's sister's house.

19. Mr. Carlson works from the nearby Washington, DC studios of Fox News.

20. Carlson attended Trinity College in Connecticut, not Yale or any other Ivy League school. However, ever since college, Carlson's TV persona has been one of the messy-haired, bow-tie-wearing, Skull and Bones Yaley conservative, like William Buckley, despite coming from a working-class family in California and not having attended an Ivy League school.

21. Until 2016, Tucker Carlson was struggling in the national cable TV genre, having been fired by CNN and then MSNBC. Network bosses at both outlets cited not only low TV ratings but also a personal dislike for Carlson.[3]

22. Liberal guests on Carlson's show would often get the best of him. Notably, in

[3] https://web.archive.org/web/20121025110901/http:/www.foxnews.com/story/0,2933,336470,00.html

2004 on his CNN show called *Crossfire*, Jon Stewart "dressed down" Carlson and ended the interview by calling him a "dick". The show was cancelled soon thereafter. In 2005, Carlson was hired by MSNBC to run an evening show called *Tucker*. It too was cancelled in 2008 for low ratings.

23. Jonathan Klein, the head of CNN in 2004 when Carlson was fired, commented about Carlson leaving, "I guess I come down more firmly in the Jon Stewart camp",[4] referring to the infamous time that Stewart called Carlson a dick.

24. In 2009, Fox News hired Carlson as a contributor and his career languished for seven years. Then, in November of 2016, right after President Trump stunned the world and won the election with support from the populist movement, Fox gave him the 8:00 PM slot for *Tucker Carlson Tonight*. The scandalous firing of Bill O'Reilly had opened up the time slot.

25. Tucker Carlson is a chameleon of sorts. His on-air political views depend on whichever national sentiment he feels might generate TV ratings. For example, he started his TV career as a far-right spokesperson of the NRA until too many school children were shot to death. When it became unpopular to carry water for the NRA, he pivoted. After it became clear in 2016 that populism was a powerful uprising and the source for TV ratings, he successfully became one himself, on TV at least. If President Trump were to lose the election in 2020, Plaintiff believes Carlson would likely jump ship and move to the left, claiming he never really supported Trump.[5]

26. At age 51, Carlson seems to be under significant stress. On November 7, 2018, fifteen or so protestors invaded Carlson's personal space by chanting outside of his home in Northwest Washington, D.C.[6] His wife was at home and he discussed it on his show. He then sold that house and moved. Now, with the current rioting near him in D.C., he seems to have moved his personal residence again.

27. On his show, Dr. Greer noticed on more than one occasion Mr. Carlson becoming short of breath as he read the teleprompter. Greer believes that he is a cigarette smoker.

---

[4] https://web.archive.org/web/20070509183431/http:/www.cbc.ca/arts/story/2005/01/05/tucker050105.html
[5] His June 25 show seemed to be throwing in the towel on Trump
[6] https://archive.thinkprogress.org/i-was-at-the-protest-outside-tucker-carlsons-house-heres-what-actually-happened-665c2dc0cb67/

28. Perhaps from the stress, Tucker Carlson is now repeating his past self-destructive behavior from his days at CNN and MSNBC where he was fired. His Fox show is the subject of frequent boycotts and advertisers have left.

29. In June of 2020, Carlson's long monologues critical of President Trump drew the ire of many of his fans. He apologized to viewers for being too distressing.

30. On July 13, 2020, Carlson announced on his show that senior writer and co-defendant Blake Neff "resigned" after CNN uncovered online racist and misogynistic rants.[7] Carlson then claimed to be going off the air for a "planned vacation". Greer believes that Carlson has been forced to take time away from his show, yet again, by Fox management. If that is the case, then Carlson lied to the nation. Ironically, Carlson's closing tag line to his show is, "the show that is the sworn enemy of lying".

31. Carlson's personal and professional lives are plagued with serial crisis, often caused by self-destructive behavior.

## Fox Corporation

32. The crown jewel of the Murdoch media empire, Fox Corporation is the newly created American company that is the spin-off product of the merger between Disney and 21st Century Fox. It is publicly traded under the ticker symbols of FOXA and FOX, worth approximately $15 Billion in market capital. Its headquarters is located at 1211 Avenue of the Americas, New York, New York 10036.

33. Fox Corporation is the parent company of the other defendants, Fox News Media, Fox News Network LLC, and Fox Business Network. Lachlan Murdoch is the CEO and Suzanne

---

[7] According to CNN, "Just this week, the writer, Blake Neff, responded to a thread started by another user in 2018 with the subject line, "Would u let a JET BLACK congo n****er do lasik eye surgery on u for 50% off?" Neff wrote, "I wouldn't get LASIK from an Asian for free, so no." (The subject line was not censored on the forum.) On June 5, Neff wrote, "Black doods staying inside playing Call of Duty is probably one of the biggest factors keeping crime down." On June 24, Neff commented, "Honestly given how tired black people always claim to be, maybe the real crisis is their lack of sleep." On June 26, Neff wrote that the only people who care about changing the name of the NFL's Washington Redskins are "white libs and their university-'educated' pets." And over the course of five years, Neff has maintained a lengthy thread in which he has derided a woman and posted information about her dating life that has invited other users to mock her and invade her privacy. There has at times also been overlap between some material he posted or saw on the forum and Carlson's show."

Scott is the CEO of Fox News media. Collectively, they will be referred to as ("Fox-related defendants").

34. Fox Corporation is a struggling company facing many business challenges, such as "cord cutting" and shrinking viewership. In general, television is a dying medium as advertisers use the Internet to target customers.

35. Compounding the problems for Fox have been a series of high-profile lawsuits by women who alleged systemic sexual harassment at the network. A large-screen Hollywood movie was made in 2019 about the saga called *Bombshell*. A Showtime limited series called *The Loudest Voice*, with Russell Crowe portraying Roger Ailes, won Golden Globes, as has HBO's ongoing series *Succession*, which portrays the Murdoch family in a bad light.

36. Suzanne Scott was promoted presumably to clean up the mess at Fox. However, the culture at Fox seems not to have improved much despite those costly and embarrassing lawsuits.

37. On July 1, 2020, it was announced that on-air anchor Ed Henry was allegedly fired for a long history of what seems to have been a "sex addiction" Also, Star Sean Hannity is rumored to be dating fellow Fox employee and morning show host Ainsley Earhardt. Plainitff has heard rumor of other sexual scandals related to top Fox talent as well.

38. In addition to the sexual harassment scandals that have plagued Fox News since 2016, the network also fell into the quagmire of racism allegations. In June of 2020, as the Black Lives Matter protests were erupting, black staff felt that the Fox coverage was insensitive. Then, when it was revealed that Tucker Carslon's head writer was fired for making racists comments online, matters got worse. "They created a cell—they created a white supremacist cell inside the top cable network in America, the one that directly influences the president… This is rank racism

excused by Murdoch."[8] Promptly, black anchor Harris Faulkner was promoted with a show of her own.

39. Long before the sexual scandals that hit Fox in 2016, the Fox group of defendants had engaged in unethical practices that lowered the standards of journalism, even by the already-low TV news standards. For example, after the terrorist attacks on September 11, 2001, Roger Ailes was recruited by the Bush administration to literally create propaganda that supported the Bush efforts to lead this nation into the longest, costliest, and most futile of wars. It was all based upon a central lie that Saddam Hussein possessed weapons of mass destruction. Fox News set the precedent for propaganda that now plagues all of TV and print news.[9]

40. The Fox group of defendants also operate in a state of paranoia, which by many accounts is the result of Roger Ailes himself being a paranoid man.[10,11] For example, Ailes abused the powers of his private security detail at Fox and extended it to monitoring employees outside of the workplace. Anyone deemed to be disloyal to Ailes was punished.[12]

41. With the death of Roger Ailes in 2017, the man who created Fox News, and the sale of the parent company to Disney, the new CEO, Lachlan Murdoch, seems to be taking the conservative news company in a more liberal direction. This too is alienating the loyal viewers.

42. Even President Trump has disdain for Fox News now. On July 13, 2020, he tweeted:

> "So hard to watch @FoxNews anymore. They are working so hard against the people (viewers) that got them there. Their contributors

---

[8] Lachlan Cartwright, et al. "Fox News Staff Erupts Over Network Racism: Bosses "Created a White Supremacist Cell"" The daily Beast. July 18, 2020.
[9] Plaintiff was offered a job at Fox and declined it, instinctively, because he had a bad feeling about the Fox culture. They seemed to care little about his journalism and more about is outward appearances.
[10] Roger Wemple. "Roger Ailes paranoid? More evidence" The Wash Post. January 8, 2014.
[11] Connor Simpson. "Inside the Paranoid World of Fox News's Roger Ailes" The Atlantic. January 8, 2014.
[12] Detailed later in this complaint, Plaintiff was the victim of this security detail abuse, leading to defamation and other damages.

> are a disaster, and all over the place. The Radical Left has scared Fox into submission, just like they have so many others. Sad, but we will WIN!"

## Fox News Media

43. Fox News Media is the division of Fox Corporation that oversees the Fox News Network LLC, and Fox Business Network. It too is located at 1211 Avenue of the Americas, New York, New York 10036. Defendant Suzanne Scott is the CEO.

## Fox News Network LLC

44. The Fox News Network LLC is the division of Fox Corporation that runs the cable TV channel known as Fox News. It too is located at 1211 Avenue of the Americas, New York, New York 10036.

45. Defendant Suzanne Scott is the CEO.

46. It is unclear why this separate LLC exists. It seems to be a legal mechanism to shield the parent company from large lawsuits that could bankrupt it, such as this one.

## Fox Business Network

47. The Fox Business Network is a brand that falls under the umbrella of Fox News Media and Fox Corporation. Defendant Brian Jones was the senior executive until December of 2019. Defendant Suzanne Scott is the CEO overseeing this brand now.

48. Fox Business Network does not seem to be an LLC like Fox News Network LLC.

## **Lachlan Murdoch**

49. Lachlan Murdoch (DOB 09/08/1971, age 48) is the CEO of News Corporation and oversees all of the defendants. He is the son of Rupert Murdoch, the founder of the Fox media empire as well as many other newspapers globally. Mr. Murdoch is a U.S. citizen and works from the offices at 1211 Avenue of the Americas, New York, New York 10036.

50. He owns a large estate at 2800 W. Buttermilk Rd., Aspen, CO, 81611-2538. His New York address is unknown to Plaintiff at this time. Records show that he also owns properties in California located at 13160 Boca De Canon Lane, Los Angeles, CA 90049.

51. In these hyper-partisan times, Lachlan and his brother James are now under immense pressure by the rest of the media to steer Fox News to the left.

## **Suzanne Scott**

52. Suzanne Scott (DOB 11/02/65, age 54) is the CEO of Fox News Media. She is a U.S. citizen and works from the offices at 1211 Avenue of the Americas, New York, New York 10036.

53. Her personal residence is at 24 Homewood Dr. Morristown, NJ, 07960-7907. She has also lived in Los Angeles.

54. As mentioned, Scott was promoted to run Fox news after the numerous high-profile sexual scandals that led to the firing of Bill O'Reilly and others. However, under her watch, the scandals have continued. On July 1, 2020, show anchor Ed Henry was fired for sexual scandal. On July 13, 2020, it was announced that Tucker Carlson was in yet another scandal. Mentioned above in the Carlson section, his senior writer was ousted after CNN uncovered racist online rants.[13]

55. Under the leadership of Scott, scandals have gone unabated, ratings have

[13] According to CNN "In a memo sent to employees Saturday afternoon, after this story was first published, Fox News CEO Suzanne Scott and President Jay Wallace condemned "horrific racist, misogynistic and homophobic behavior." "Neff's abhorrent conduct on this forum was never divulged to the show or the network until Friday, at which point we swiftly accepted his resignation," Scott and Wallace wrote. "Make no mistake, actions such as his cannot and will not be tolerated at any time in any part of our work force.""

dwindled, cord-cutting has accelerated, and efforts to modernize with online streaming content have been a dismal failure.

## Justin Wells

56. Justin Wells (DOB 02/25/1983, age 37) is the senior producer for Tucker Carlson. He is a U.S. citizen living at 117 Edgecombe Ave. Apt 2, New York, NY, 10030.

57. He owns an additional property at 46 Pinecrest Dr. West Shokan, NY 12494-5327.

## Blake Neff

58. Blake Neff (DOB August, 1990, age 29, to the best of Plaintiff's knowledge) was the senior writer for Tucker Carlson until being fired on July 13, 2020.

59. He is a U.S. citizen living at 1505 28th St S Apt 8 Arlington, VA, 22206, to the best of Plaintiff's knowledge.

60. As mentioned above in the Carlson and Scott sections, Mr. Neff was fired after CNN uncovered online posts he made with racists and misogynistic comments.

61. According to CNN, "In a recent article in the Dartmouth Alumni Magazine, Neff said, "Anything [Carlson is] reading off the teleprompter, the first draft was written by me.""

## Charles Gasparino

62. Charles ("Charlie") Gasparino (DOB 01/28/1962, age 58) is a reporter for the Fox Business Network. He is a U.S. citizen and works from the offices at 1211 Avenue of the Americas, New York, New York 10036.

63. His personal residence is at 530 E. 20th St. Apt 8A, New York, NY, 10009-1324.

64. Gasparino is a loose cannon with a temper, frequently engaging in feuds either on the air or via email, as will be detailed below. He has used crude references to bestiality and other profanity in corporate emails. Not surprisingly, he is still employed by the Fox-related defendants.

## **Brian Jones**

65. Brian Jones (DOB 7/22/1960, age 60) is the former head of the Fox Business Network until being fired in late 2019. He is a U.S. citizen and had worked from the offices at 1211 Avenue of the Americas, New York, New York.

66. His personal residence is at 43 W. 119 St. New York, NY 10026. The property is highly leveraged.

67. Plaintiff believes that Mr. Jones was a congressional staffer and campaign manager for President Bush, which led him to meet Roger Ailes, the eventual founder of Fox News. Jones was the only African American senior executive in the company at the time, to Plaintiff's knowledge.

68. Mr. Jones does not seem to be currently employed by a large media company.

## **News Corporation**

69. Part of the Murdoch media empire, News Corporation is a publicly traded company with the ticker (NWSA), among others. It is worth approximately $7 Billion in market capital. The CEO is Robert Thomson. It too is located at 1211 Avenue of the Americas, New York, New York 10036.

70. The company is primarily an old-fashioned print content creator, with assets, such as The Wall Street Journal and HarperCollins. As such, it is part of a dying industry with shrinking revenue. The company has made several series of layoffs. It was spun out of the larger Fox company due to these problems.

## **Dow Jones**

71. Dow Jones is a brand and asset under the News Corp parent company. It operates The Wall Street Journal, inter alia.

72. The WSJ is another failing operation with a rapidly shrinking subscriber base.

## Gerard Baker

73. Gerard Baker (DOB 01/24/1962, age 58) is the, "former Editor-in-Chief of Dow Jones and The Wall Street Journal. He served as Editor-in-Chief between 2013 and 2018, and was Deputy Editor-in-Chief between 2009 and 2013. Previously, he was U.S. editor and an assistant editor of the Times of London."[14] He still works for News Corp in some capacity.

74. Mr. Baker is a British citizen. It is unknown whether he is also a U.S. citizen. He lives in the United States at 504 E. 87th St. New York, NY, 10128.

75. Plaintiff is not the only person who has a complaint against Mr. Baker. In June of 2020, more than 150 Wall Street Journal employees signed a group letter complaining about how the paper was being managed and singled out Mr. Baker. "Faulting columns Mr. Baker had written on race, that letter said his work had violated newsroom standards. Mr. Baker was moved to the opinion staff the day after the letter was sent."[15]

## Jennifer Strasburg

76. Jennifer "Jenny" Strasburg (DOB 6/11/1970, age 50) is a reporter for The Wall Street Journal. She is a U.S. citizen and her last known address was 3 Greenview Way, Montclair, NJ, 07943-253, However, she seems to have been relocated by her employer and is now living in London, England, UK now. She has lived in San Francisco too.

---

[14] Per the bio on the Wall Street Journal website.
[15] Mark Tracy and Ben Smith. "Wall Street Journal Staff Members Push for Big Changes in News Coverage" The New York Times. July 10, 2020.

# PERSONS of INTEREST

## GMSC Security

77. GMSC Security, also known as Guard Management Services Corp., seems to have made an effort to shield its true corporate identity. However, there is evidence that it is a New York LLC with an office listed at Eleven Penn Plaza, Suite 110, New York, New York 10001.

78. A person named Michael Doherty seems to be the owner.

## Rudolph Giuliani

79. "Rudy" Rudolph William Louis Giuliani (DOB 5/28/1944, age 76) is a U.S. citizen.

80. He lives at 45 E 66th Street, 10th Floor, New York, NY 10065, among other properties.

81. Giuliani is the former U.S. Attorney for the Southern District of New York, former Mayor of New York City, a failed senate and presidential candidate, and the current personal lawyer for President Trump.

82. Giuliani has numerous media platforms from which he is expressing his opinions daily.

83. Mr. Giuliani has been mocked in the national media, such as *Saturday Night Live*, for his erratic behavior on Fox News television.

84. His counsel to President Trump has been called into question as well. The Ukraine scandal that led to partisan impeachment of President Trump seems to have originated with Mr. Giuliani.

## JURISDICTION AND VENUE

85. The Plaintiff's complaint contains federal claims arising under diversity pursuant to 28 U.S.C. §1332(a)(1). This matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

86. Plaintiff's state law claims against Defendants arise from the same common nucleus of operative facts and are of such character that the claims are so related to claims in the action within such original jurisdiction of the Court that Plaintiff's state law claims form part of the same case or controversy. Thus, this Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

87. Venue in this district is proper pursuant to 28 U.S.C. § 1391(b)(1) because all but two Defendants reside in the district of the Southern District of New York, and all Defendants but one are residents of the State of New York.

## FACTS

## Dr. Greer's career path into media

88. The Plaintiff, Steven E. Greer, MD, has unique experience in multiple fields that has made him a sought-after expert for media interviews. In 1991, he obtained is undergraduate finance degree. Then, after medical school, he started his career in surgery. Then, he became a Wall Street professional.

89. In 2004, Dr. Greer made his first cable TV news appearance on CNBC and was interviewed by Jim Cramer.[16] He made subsequent appearances on Cramer's show.

90. As previously detailed, Greer then ventured into the media industry by creating the first of its kind Internet video channel called The Healthcare Channel. In 2008, Greer partnered The Healthcare Channel with Thomson Reuters to create interviews with industry experts for a fee. In 2010, he partnered with the University of Miami's medical system to create

[16] https://youtu.be/9G9s4JU7Xjg

similar content. Dr. Greer also met with several major national news networks, such as ABC, for other partnership deals and was represented by top Hollywood talent agent Ari Emanuel.

## Enter Fox

91. In 2008, Brian Jones of The Fox Business Network recruited Plaintiff to be their healthcare expert. He began to appear at the start of the hour, 7:00 AM, on their flagship morning show hosted by Alexis Glick, produced by Brian Donlon. After numerous appearances, Fox Business made Plaintiff a written offer to work as a contributor (Ex. A). The initial offer was significantly lower than Plaintiff had requested. They raised the offer but Plaintiff still rejected it.

92. After that, Plaintiff sent an email to Brian Jones informing him that he would no longer be available as a guest.

93. Then, producer Donlon then emailed Plaintiff on April 29, 2009:

> "Dr. Greer:
>
> My staff passed on this note to me this morning. I certainly understand conflicts -- schedule and otherwise that prevent people from appearing -- I just wanted to make sure it was nothing something on our end that forced you to make this decision. **We always enjoyed having you as a guest and I believe our audience found your information thoughtful and insightful**.
>
> Regards,
> Brian Donlon
>
> ___
>
> Brian Donlon
> Executive Producer
> Fox Business Morning & Money for Breakfast
> 212.601.7995" (Emphasis added)

94. As time passed, Brian Jones invited Plaintiff back on the network and he continued again to serve as a guest, without pay, until March of 2013.

95. Plaintiff has been interviewed by many of the staff at Fox Business. Charles

Payne and David Asman were two of the network staff who found Plaintiff's commentary newsworthy. Producer "Jake" Novak was a fan of Plaintiff's and the two worked on many stories together.

96. Charlie Gasparino of Fox Business particularly found Plaintiff's Wall Street experience valuable, interviewing him and also using his news tips. In 2011, for example, Plaintiff broke the important story about "expert networks" and their role in the insider trading prosecutions that were underway by the U.S. Attorney for the Southern District of New York.[17]

97. Also, in 2011, Fox News, with a much larger audience than Fox Business, began to use Plaintiff as an expert for interviews. He appeared on the top-viewed O'Reilly Factor show and millions of people saw the segment.[18]

## **Enter News Corp**

98. In 2012, Plaintiff published several Op-Eds and letters in the Wall Street Journal[19] ("WSJ") and became a contracted freelance contributor (Ex. B). Plaintiff's work eventually led to the ouster of a senior official at The Centers for Medicare and Medicaid Services.[20] The WSJ is a newspaper owned by Dow Jones, which is a division of the News Corporation.

99. In December of 2012, Plaintiff approached the head of News Corp's Dow Jones division, Lex Fenwick, about creating a video website as part of the WSJ that would be an extension of his Healthcare Channel. It would have legally provided healthcare experts to viewers and avoided the insider-trading flaw of the "expert network" business model.

100. Mr. Fenwick had been the CEO of Bloomberg providing computer terminals to investors and knew Plaintiff from his Merrill Lynch days. On February 19, 2013, the two met over lunch at a Japanese restaurant near News Corp and Mr. Fenwick liked the idea.

101. However, unbeknownst to either men, Mr. Fenwick was on his way out, soon to be replaced by Gerard Baker. Mr. Baker had run some tabloid newspapers in London for Rupert

[17] https://youtu.be/oPquTlXQhLA
[18] https://youtu.be/J0di06ZeTdU
[19] https://thehcc.tv/2012/10/22/wall-street-journal-articles/
[20] https://thehcc.tv/2019/10/01/cmmi-director-leaves-after-healthcare-channel-investigates/

Murdoch.

102. Plaintiff's idea for a healthcare website under the WSJ brand never materialized after Mr. Fenwick departed. However, Plaintiff soon noticed that the WSJ had pursued the idea on their own, without credit or payment to Plaintiff. Plaintiff hired a law firm and sent a legal warning letter on April 17, 2014 (Ex. E), but he lacked the resources at the time to pursue actual litigation.

## **The Jenny Strasburg ordeal**

103. Meanwhile, Plaintiff had also begun helping a WSJ reporter, Jenny Strasburg, who is still a reporter there. Starting in late 2010 and going through to 2013, Plaintiff was the source of tips crucial to a series of front-page WSJ stories by Strasburg[21,22]. The articles were about "expert networks" that matched up hedge fund investors with medical doctors conducting stock-moving clinical trials (i.e. the same topic that Charlie Gasparino used for stories[23]). At the time, this secretive industry was not well known to people outside of the hedge fund community.

104. Plaintiff met with Strasburg for coffee in Tribeca sometime in the Fall of 2010. Greer had been a coworker of Chip Skowron, a hedge fund investor arrested for insider trading, and also knew the "expert network" industry well. Strasburg had never heard of expert networks before. In fact, at first, she was skeptical that Plaintiff was really giving her reliable information.

105. While Plaintiff did not expect to be quoted or credited in the first news article by Strasburg, he began to wonder, after several articles made the front page of the WSJ without mentioning him, whether or not she was unethically concealing from her editor the true nature of her sources. Given Plaintiff's legal emails and letters sent to Strasburg's bosses related to their theft of his healthcare blog idea, it seemed logical and likely that she would use Plaintiff's help while not crediting him.

---

[21] Example #1 of several front-page WSJ articles by Strasburg made possible only because of Plaintiff's tips: "Insider case Alleges Doctor's Tips" By Jenny Strasburg and Jean Eaglesham. The WSJ. November 2, 2010.
[22] A second example: "Hedge Funds Seek Clarity on 'Expert Networks'" by Steve Eder and Alicia Mundy. The WSJ. February 1, 2011.
[23] https://youtu.be/oPquTlXQhLA

106. Plaintiff spoke with Strasburg's editor and confirmed that Strasburg had never informed him of Plaintiff's contributions.

107. After that, the cordial cooperative relationship between Strasburg and Plaintiff changed. Plaintiff believes that Strasburg was reprimanded by her bosses and was not on the front page of the WSJ again for quite some time.

108. On April 11, 2012, Plaintiff called Strasburg at work to ask whether she had been responsible for smearing Plaintiff's name with other journalists he had worked well with, such as Alicia Mundy. Strasburg failed to deny the accusation. At no point during the call did Plaintiff threaten her, or even raise his voice. In fact, Plaintiff continued throughout the rest of the year on his business negotiations with Gerard Baker, Wall Street Journal, and Dow Jones. They were working on creating a legal version of the "expert networks" in the form of a WSJ Internet site.

109. On March 26, 2013, Plaintiff was invited by Jones to be a guest on Fox Business. He was driven by a Fox-paid car service to the headquarters at 1211 Avenue of the Americas. However, the security desk in the lobby, staffed by the GMSC defendant, would not let Plaintiff pass. The employees were clearly reading some sort of warning message on their computer screen that cautioned against allowing him through. Only after Plaintiff called Brian Jones did they clear him and the Fox Business segment was eventually filmed.[24]

110. Being humiliated in public, no explanation was given for the security desk embarrassment. Plaintiff assumed that the News Corporation people might have been behind it all. Brian Jones later confirmed that.

111. The next day, on March 27, 2013, Plaintiff called a man named Tom O'Shea (sp?) working as a security expert for the Fox companies. Plaintiff explained what had happened the day before and asked him to investigate. Mr. O'Shea said that he would, but no one ever got back with Plaintiff with any explanation for the embarrassing incident.

112. <u>At no time did any News Corp or Fox employee ever communicate to Plaintiff that he had done anything wrong or was not allowed into the building</u>. Consistent with classic

---

[24] https://youtu.be/JigJBHN724A

blacklisting, the victim of the conspiracy was in the dark.

113. In the months after the incident, Brian Jones would continue to accept calls from Plaintiff and act as if there were no problems. However, Greer was not being invited to do any further Fox Business segments despite having newsworthy story ideas. He asked Brian Jones point blank whether he had been blacklisted and Jones assured Greer that he had not been.

## **The Gasparino admission to blacklisting**

114. The Charlie Gasparino interview of Greer on Fox Business in 2011, described above, was the culmination of months of Greer providing story ideas and tips to Gasparino. Listed below are some of the emails from Gasparino to Greer showing his gratitude for Greer's help. For examples, (typos from the original texts are preserved):

> December 20, 2010: "Thanks ill touch base w u later and promise not to scream Doing a hit in 10 mins"
>
> December 20, 2010: "Thanks steve will be making calls"
>
> December 23, 2010: "Sounds good to me Im out till jan 3 but lets do this then when people are watching"
>
> January 5, 2011: "I remember u called it"
>
> Janaury 7, 2011: "This is great let's talk monday morn I'm in scottsdale on a biz trip today"
>
> January 25, 2011: "Ok made the formal request lets see what they say"
>
> January 25, 2011: "Brian jones says it ok so ill run by my direct person and we shld be in biz Lets shoot for next week; im out of town after today poss back fri but next tues or weds depending on news shld work"
>
> February 5, 2011: "I'm in dallas at sb my direct boss has no problem w u coming on w me I've ccd my producer sital so we can get ball moving I ur still into it next week Sital stevens number is at bottom of email I want to discuss expert networks the rise of them and misuses w steven since he knows a lot abt that so call him monday and flesh

> out and discuss a time w 1pm show"
>
> February 24, 2011: "Thanks When r u free for tv?"
>
> April 14, 2011: "Sital will call u in a few to narrow the interview --wanna get a feel for the bigger invest into experts how the spec is that another hoe will soon drop --how pervasive insider trading is Does that work??"
>
> April 15, 2011: "Thanks so much Steven! Sital"
>
> May 5, 2011: "I just proposed getting u on to discuss w larry mcdonald and unpack this"
>
> August 3, 2011: "How well did u know this guy Skowron… U got a few mins later today for a de brief?"

115. As the subsequent years went by, Plaintiff focused on his clinical medicine business and less on The Healthcare Channel. He kept members of the media, such as Gasparino, on his blast email lists.

116. Before and after the 2013 lobby incident detailed above, when security held up Plaintiff before taping a Fox Business segment, Charlie Gasparino continued to read Plaintiff's emails with news tips and turn them into stories on the air. However, he never credited Plaintiff as being his source and never invited him to be interviewed on-air in their studios.[25]

117. In 2016, while on a West Coast trip, Plaintiff randomly encountered Gasparino in Beverly Hills at Spago restaurant and the two were cordial. In October of 2018, the two again randomly ran into one another. This time, it was at a New York eatery, and they were cordial again.

118. In March of 2019, when Plaintiff was getting ready to publish a book and wanted some testimonials for the inside cover, he asked Charles Payne and Charlie Gasparino. They both made evasive excuses (detailed more later) for why they could not assist Plaintiff, which is circumstantial evidence of the blacklisting.

---

[25] For example, in August of 2011, Greer knew about a secret fundraising dinner in Manhattan being hosted by President Obama and informed Brian Jones and Charlie Gasparino. Mr. Gasparino promptly took a film crew to the location for a live segment. Greer was never credited.

119. On July 13, 2019, Plaintiff was in possession of knowledge relating to convicted pedophile Jeffrey Epstein that no other person in the media was reporting. The national media was lazily regurgitating the unsubstantiated description of Epstein as being a wealthy "hedge fund manager" However, Greer knew that no one in the hedge fund industry had heard of Epstein and this false job description was a ruse, much like Bernie Madoff's fake hedge fund. Plaintiff gave the tip to Gasparino via email.

120. Instead of Gasparino admitting that had been wrong on Epstein in his reporting, he replied essentially that he already knew what Plaintiff had given him in the tip. He claimed to have previously reported in an obscure blog the fact that Epstein was in fact being paid by billionaire Les Wexner.

121. Plaintiff then replied with a scathing reality check, essentially calling Gasparino a liar. He detailed how Gasparino had evaded scrutiny of his bogus reporting.

122. To emphasize the point, Plaintiff watched Gasparino segments on Fox Business for about a week and easily found cases of Gasparino revising history or making up sources.[26,27]

123. As part of the July 13th email exchange, Gasparino made his first of several threats to sue Greer (typos from the original texts are preserved):

> **Gasparino:** "LSuing rich people who say stuff that demonstrably false is fun" — my lawyer He says you can quote him on that"j
>
> **Greer:** "Please, I am begging you, sue me"
>
> **Gasparino:** "Ok dummy you got it Make sure you can prove that blonde (a marketing professional) is a bimbo because she will sue you as well And thanks for confirming the CNBC producer was there as were others This is gonna be easy" (Gasparino was referring to the October 2018 encounter between the two)
>
> **Gasparino:** "I am So will he alleged bimbo But please keep sending me scoop on Epstein I already know Cg"

---

[26] https://greerjournal.com/sources-say-charlie-gasparino-doubles-down-on-the-wild-guessing-about-cbs-viacom/
[27] https://greerjournal.com/sources-say-charlie-gasparino-the-fortune-teller-on-t-mobile-merger/

124. One day later on July 14, 2019, Gasparino was still obsessed with Plaintiff and revived the spat. He initiated another email exchange with Plaintiff:

> **Gasparino:** "I'd invite you to the Fox News offices to discuss **if you could get in**" (emphasis added)

125. He was implying that Plaintiff was banned from the building. This was the first insinuation by Gasparino that Fox was blacklisting Plaintiff.

126. Plaintiff then replied immediately:

> Greer: "So, **you are admitting that Fox News has defamed me with a blacklisting security policy, and is thwarting my ability to promote a book, which is millions in damages.** Thank you" (emphasis added)

127. The two men did not correspond over the next 11-months.

128. Then, on June 6th, 2020, Plaintiff received reports from readers of his GreerJournal.com (formerly called BatteryPark.TV) that Gasparino was insinuating President Trump had committed a crime in manipulating economic data. The 2.5 Million jobs added in May shocked the media and the markets leading some commentators on TV, such as Gasparino, to maliciously suggest that Trump fudged the numbers. Plaintiff emailed Gasparino stating:

> Greer: "People watched you yesterday and were so appalled by your conspiracy theory that Trump fudged the labor numbers that they told me about it. They had no idea that I knew you.
>
> So, you have now pivoted to NeverTrump in order to pander to the Paul Ryan faction within Fox. Funny.
>
> I do give you credit for surviving this long. You are a true embarrassment to journalism and yet you have managed to stay on the air."

Gasparino replied promptly on June 6th with the following (typos from original texts preserved):

> **Gasparino:** "I never reported on that but tell me **what's the weather like in Russia?** Now I'm sending his email to the FBI
>
> Every harassing email you send me goes to my lawyer and the fbi and yes i will sue you for defamation, Comrade" (emphasis added)
>
> **Greer:** "I demand that you have these likely fictional lawyers contact me, and I am forwarding this to real FBI to make sure they know you are using their name. The last time you threatened me I demanded they contact me and you never did. Speaking of defamation, what does the Russia comment you made mean?"
>
> **Greer:** "The fact that you think the real FBI (not some ex-FBI who is a Fox contributor) would lift a finger to protect a nobody working on a small cable channel few people watch is mind boggling. This goes to my point about your delusions of grandeur. It is like you are a small boy dreaming up things from a comic book."
>
> **Gasparino:** "I'm going to sue you for slander and report you to the fbi which i have been covering for years dummy Enjoy golf !"
>
> **Gasparino:** "Btw **why are you banned from the fox building? Who got you banned? Wasn't me. Did you stalk someone else? That's why the fbi is involved**" (emphasis added)

129. For the second time within 12-months, Gasparino memorialized via email the fact that Greer had been banned from the Fox building and blacklisted by insinuating Greer had been sent to Siberia.

130. More concerning, Gasparino claimed that valuable FBI resources had been diverted from real crimes to deal with the frivolous complaints about Greer lodged by entitled media elites at Fox. If true, that is a serious crime as well as defamation *per se* that contributed to the blacklisting.

## Fox's sabotage of Greer's new books

131. In March of 2019, Plaintiff published his book of essays called *Rules to Stop Radicals*.[28] It correctly predicted the eventual riots in the streets and the ongoing Second Civil War that are happening now. It has received positive reviews from members of politics, academia, and media.

132. In September of 2019, Plaintiff published his book *The Medical Advocate*.[29] Among other things, it predicted the poor healthcare that was soon thereafter delivered in New York, which led to the inordinately high death rates in certain hospitals and the massacre of thousands in nursing homes. The book idea and content are unique. It has received positive reviews from the best doctors in the world. Healthcare impacts the lives of all Americans. Therefore, this book has "best-seller" potential if it could be properly marketed in the mainstream media.

133. Plaintiff and his books are the type of media story that Fox News or One America News would normally have on their shows. Of note, HarperCollins is a major publisher and is owned by News Corp.

134. On May 29, 2019, Plaintiff spoke to Brian Jones on the phone to inquire whether Jones had received the book *Rules to Stop Radicals* that was mailed to him at the Fox building. Jones denied any knowledge of a book. Plaintiff then called the building mail room security and learned that packages are not delivered to on-air talent unless they approve the shipment. Plaintiff then notified Charles Payne, Brian Jones, and Charlie Gasparino that another book would be arriving via Amazon package in a second attempt to deliver. However, again, no one at Fox acknowledged receiving them. The books either were either never authorized to get past the mail room or they were received by the recipients and those Fox employees lied to Plaintiff about not receiving them.

135. Also, in March, Plaintiff emailed Fox Business' Charles Payne and Charlie

---

[28] Steven E. Greer, "Rules to Stop Radicals" Amazon.com. 2019.
[29] Steven E. Greer, "The Medical Advocate" Amazon.com. 2019.

Gasparino to see if they could provide a quote of endorsement for the book. On March 24, 2019, Charles Payne declined via email stating, “I'll check it out...doubt I will get clearance for blurb or endorsement but congratulations” Gasparino declined via email, stating, “I didn’t but I cant review anyway because of some rule around here that has nothing to do w you” [sic].

136. That last portion of Gasparino’s comment, “has nothing to do w you”, is circumstantial evidence of the blacklisting. Why would Gasparino feel the need to assure Plaintiff that he was not being blacklisted if there were no such effort actually underway?

137. Charles Payne’s decline to help Plaintiff is also evidence. Plaintiff has been a guest on Payne’s Fox shows many times. Plaintiff and Payne are still cordial to this day. Why would Payne refuse to do something as simple as give Plaintiff a testimonial for his book?

138. Meanwhile, Plaintiff had mailed copies of the book to Tucker Carlson in Washington, DC. Plaintiff’s publicist, Trevor Fitzgibbon, had also contacted Tucker Carlson via text message and email too. Carlson knows the FitzGibbon from other stories pitched to him and normally replies. Yet Tucker Carlson replied to none of these outreaches and Plaintiff was not booked as a guest on Carlson’s show.

139. Plaintiff’s publicist had also directly contacted the head of One America News (“OANN”), Charles Herring, and received no offer for an interview of Plaintiff either. Plaintiff also asked via email whether Mr. Herring could help him publish his books. Of note, Mr. Herring talks with people at Fox and knows about Plaintiff’s past on-air relationship with Fox.

140. Herring knows Plaintiff well and has a high regard for him. He has asked Plaintiff for favors on more than one occasion.

141. For example, Herring had one of his producers, Ryan Girdusky, contact Plaintiff asking for the strange favor of locating the personal pilot to Jeffrey Epstein. News reporters are supposed to have those skills. On July 19, 2019, Girdusky asked:

> Girdusky: “Would you be able to get the phone number of Larry Visoski. He was Epstein’s main pilot and I believe he lives in Florida but I’m not 100% sure.”

142. Plaintiff promptly provided the information to Girdusky and cc’d Herring.

143. Herring has also been highly complementary of Plaintiff's work. On August 12, 2019, he emailed Plaintiff:

> "I give you 5,000 bonus points for calling the explosion in Russia a "nuclear" related explosion. NYT's reporting today believes a small fission mobile reactor May have exploded."

144. On April 9, 2020, Herring emailed Plaintiff, "**Good Morning, What is the best email you have for Tucker. Best, Charles Herring**"

145. His network, OANN, had gotten into a tussle with the West Wing's White House Correspondents' Association over seating assignments and Mr. Herring wanted Tucker Carlson to cover their story. Plaintiff provided the information. Then, presumably, Herring and Carlson communicated.

146. Then, presumably as a reward for Plaintiff's help, Herring had his Washington, DC team arrange to interview Greer about pandemic issues. The segment was posted on OANN on April 16, 2020.[30]

147. John Hines, the man who conducted the interview, wrote to Plaintiff on April 20:

> Hines: "Dr. Greer, Our interview. Thank you for your help ! John Hines"

148. As established above, the owner and operator of OANN, Charles Herring, knows Plaintiff and has a high regard of him. For Herring then to have ignored Plaintiff's book publicist in 2019, and not have him back on OANN given Plaintiff's track record on the radio of predicting important pandemic events, is highly suspect. It is circumstantial evidence of a blacklisting by Fox that other conservative outlets have been chilled into obeying.

149. An appearance by a book author on a cable TV show that garners millions of viewers, such as Carlson's, can turn a book into a best-seller overnight. For example, former New York Times reporter Alex Berenson self-published his book called *Unreported Truths*

[30] https://greerjournal.com/steven-e-greer-md-delivers-another-superb-tv-interview-on-covid-19/

*about COVID-19 and Lockdowns*. He was a guest on the Tucker Carlson show in June 10, 2020 to promote the book launch.[31] The book immediately became a New York Times best-seller despite having no traditional publisher to market the book. The book is self-published on Amazon.com, and Amazon tried to block the book until Tucker Carlson exposed the scheme.

150. If the national media, such as Fox News, blacklists a new book, as they have done with Plaintiff's, it destroys the commercial value. Conversely, a single appearance by an author on a show, such as Carlson's, can sell hundreds of thousands of copies overnight.

## Fox's sabotage of Plaintiff's radio career

151. In March of 2020, when the Wuhan coronavirus[32] pandemic started to cause governors to issue lockdown house-arrest orders across the country, Plaintiff was only doing interviews for the small webcast video show called *Liquid Lunch* hosted by John Tabacco. The producer for the show, Frank Morano, had Plaintiff on March 9, 2020 to discuss the pandemic.[33]

152. It was an important interview because Plaintiff was the first person in the country to urge that facemasks be worn by the general public. At the time, Anthony Fauci, the Surgeon General, and the CDC were all flagrantly lying to the American public to prevent a run of supplies they thought were needed by hospital workers.

153. Unlike Asian countries, facemasks are stigmatized in the U.S. Therefore, Plaintiff's comments were bold and prescient. On July 8, 2020, producer Frank Morano acknowledged this months later on his radio show.[34]

## Enter WABC (770 AM) radio

154. In April, because Plaintiff's performance on *Liquid Lunch* was received well by viewers, it prompted Mr. Morano, who also produced the *Joe Piscopo Show* on New York radio

---

[31] https://news.yahoo.com/alex-berenson-theres-almost-no-004726635.html
[32] "COVID-19" is not a proper scientific name for the virus. It is slang created by the W.H.O. and media. The proper medical terms are either SARS-C0V-2, the coronavirus, or The Wuhan coronavirus
[33] https://greerjournal.com/my-appearance-on-newsmax-on-covid-19-coronavirus/
[34] https://greerjournal.com/frank-morano-of-77wabc-interviews-steven-e-greer-md-july-8-2020/

station AM 970, to invite Plaintiff onto that show.

155. On radio, Plaintiff quickly became one of the leading voices in the national media on pandemic issues. He was a rising star. His comments were heard by the White House, Anthony Fauci, and billionaire media company owners, such as John Catsimatidis.

156. Plaintiff was the first person to correctly predict and note the most important developments in the pandemic. For example, long before it was fashionable to doubt Anthony Fauci, Plaintiff stated that Fauci's predictive models and estimates of deaths were fraudulent. Plaintiff was correct (Ex. C).

157. Joe Piscopo frequently acknowledged this on the air (Ex. C), such as:

> April 2, 2020- "**Wow. Dr. Greer, this is the most vital 20-minutes we've done on the radio, and we're just so privileged to have you**." (emphasis added)
>
> April 9, 2020- "This is the man who told us about hydroxychloroquine and the Z-Pak weeks ago. Weeks ago, he said..."
>
> May 4, 2020, "Well, you are the man. You are the man. You are so ahead of the curve. I got to tell you right now—and-and I'm telling you—everything that you talked about, Dr. Greer—and I keep giving you a shoutout on the program, and I did-as I did today—you talked about—and we played the audio, uh last week, played the audio—of you just saying very casually, "oh, we have-we have some drugs for this virus." And you said Rem-Remdisivir. You said-you talked about hydroxychloroquine and Z-PAK. You were there…"
>
> May 12, 2020- "You were the first to talk about remdesivir… You know, Dr. Greer we appreciate your expertise. We appreciate you being with us. Come back soon. **Yeah, let's talk soon, uh, because everything you've said comes to fruition**." (emphasis added)
>
> Greer appearances on May 22, June 3, June 18 drew similar comments (Ex. C).

158. Plaintiff became a weekly regular on the Piscopo show. Producer Morano would

often notify Plaintiff when listeners complimented him. On June 3, for example, he stated:

> Morano: "**You always make a splash. I'll tell you that.**"

159. In radio industry terms, Plaintiff "lit up the switchboard".

160. Listening to Plaintiff's performances were staff from nearby New York radio station WABC (770 AM), including the owner, John Catsimatidis. The president of that station, Chad Lopez, reached out to Plaintiff on May 4, 2020 to invite him to be on their morning show, *Bernie & Sid*[35], as well as an afternoon show hosted by former mayor Rudy Giuliani.[36] Both appearances went very well.

161. On May 21, 2020, David LaBrozzi, the head of programming at 77WABC, wrote Greer:

> LaBrozzi: "Dr. Greer, The segment was great!! Thanks for making the time for us. **We will definitely have you back**. Thanks again!" (emphasis added)

162. Chad Lopez called and stated that Plaintiff could come on any of his station's shows whenever he had a news story to break, as opposed to waiting for an invitation. The president of the station essentially gave Plaintiff producing powers. Subsequently, Plaintiff began to email the WABC staff whenever he had a good idea for a topic to discuss. However, the recipients of the emails never replied and Plaintiff removed them from his email list.

163. Of note, the cast of the *Bernie & Sid* show used to be part of Don Imus' show that was on in the morning at Fox Business. It was eventually was cancelled. Plaintiff suspects they know of his relationship with Fox. That was one reason Plaintiff was reticent to even do their show. But Chad Lopez pressed Plaintiff, assuring him that it was not "shock jock" radio.

## Enter Rudy Giuliani

164. Mentioned previously, Plaintiff came into contact with Rudy Giuliani when Rudy approached Plaintiff out of the blue after hearing Plaintiff on a competing radio station. It was an

---

[35] https://greerjournal.com/wabc-radio-morning-show-interviews-steven-e-greer-md/
[36] https://greerjournal.com/rudy-giuliani-interviews-steven-e-greer-md-on-wabc-radio-may-6-2020/

honor for Plaintiff to have been invited. Rudy Giuliani is the former mayor of New York City, former U.S. Attorney, and current personal lawyer for President Trump.

165. Giuliani is an important part of American history given his role as mayor after September 11th, 2001 terrorist attacks on New York.

166. However, more infamously, some historians might credit Giuliani with starting the impeachment process of The President of the United States by concocting an ill-advised scheme to hurt Democrat presidential candidate Joe Biden via pressure on Ukraine officials to investigate Biden's corruption. The plan backfired badly.

167. Despite his flaws in judgment recently, Plaintiff viewed Giuliani as an honorable man trying to do well for the country. He is still the personal lawyer for President Trump, which makes him a relevant current player in the political game.

168. However, when Plaintiff dutifully prepared to appear on Rudy's and the *Bernie & Sid* WABC shows, the producers rudely wanted to reschedule. Since they had approached Plaintiff, and not the other way around, and since being on their small shows would do little good for Plaintiff, he replied to Chad Lopez and Dave LaBrozzi that he would cancel completely. Plaintiff also stated that the morning "shock jock" radio genre was not something with which he wanted his respectable name to be associated.

169. Surprisingly, WABC (770 AM) did not take "no" for an answer. They reassured Plaintiff that their morning show was not "shock jock" Plaintiff then eventually appeared as a guest on the shows, as detailed above.

170. It was learned later that the owner of the station, John Catsimatidis, was the one who had instructed his staff to recruit Plaintiff after hearing and liking his discussions on the Joe Piscopo show.

171. After Plaintiff appeared on Giuliani's radio show, he then invited Plaintiff to be a guest on his hour-long self-produced podcast.[37] It is a professionally filmed and edited multi-media platform. Former guests include actor Academy Award winner John Voight, White House

[37] https://greerjournal.com/rudy-giuliani-interviews-steven-e-greer-md-on-his-podcast-tv-show-may-15-2020/

Chief of Staff Mark Meadows, and many other “A-listers” in politics and media.

172. Plaintiff’s appearance on this podcast show also went well, like his radio interview with Giuliani. Some quotes from Rudy during the podcast segment were (Ex. F):

> Giuliani: “Today, we are very very honored to have Dr. Steven Greer…”
>
> “…who is a doctor, and a really accomplished doctor, a good doctor, and also a Wall Street expert.”
>
> “But also has been in a number of other fields, including investment banking…He brings a broad perspective to this.”

173. Plaintiff’s segment on the podcast apparently went so well that Mr. Lopez of WABC called Plaintiff on a Saturday (May 16th, 2020), shortly after meeting with Giuliani, to tell him that Giuliani “really enjoyed” having Plaintiff on his podcast.

174. Mr. Giuliani then mailed Plaintiff a handwritten “thank you” card, dated May 18th, 2020, that states:

> “Dear Steve,
>
> Thank yo so much for the book. I will read it with enthusiasm. Hope to talk soon.
>
> Rudy”


RUDOLPH W. GIULIANI

May 18, 2020

Dear Steve,

Thank you so much for the book. I will read it with enthusiasm. Hope to talk soon.

Rudy

175. Giuliani was clearly recruiting Plaintiff hard and seeking to bring him into his inner circle. The whole thing seemed quite surreal to the skeptical Plaintiff, but he ran with it anyway out of curiosity. He wanted to learn whether or not he was being manipulated as a fool or being sincerely approached.

176. After three-months of popular success in the large New York City market as the voice of reason during the pandemic, Plaintiff had an idea for his own show. On May 25, 2020, he emailed Chad Lopez and others at 77 WABC the idea, which was:

> "I have an idea. I am THE Medical Advocate after all. I could field questions from your listeners who are having problems with their hospital or assisted living."

177. On May 25th, Plaintiff also sent Mr. Giuliani a text message with the same idea and mentioned that he would like for Giuliani to co-host. Giuliani promptly replied minutes later, "**Let's discuss**"

178. Then, on May 25th, an historic even happened. George Floyd was killed by police in Minneapolis triggered mass rioting across the country. The lawlessness in New York City and elsewhere led to Mr. Giuliani making more TV appearances than normal, particularly on Fox News.

179. Over the next two-weeks or so, Plaintiff tried several times via email and text message to follow up with Mr. Giuliani about The Medical Advocate show that would be co-hosted by Giuliani. However, he received no replies. His press secretary, Christianné Allen, was also ignoring him. Plaintiff began to wonder whether or not Fox News had mentioned something to Giuliani so as to sabotage their relationship, consistent with the alleged blacklisting in this complaint.

180. On June 6, 2020, Plaintiff had a follow-up phone call with Chad Lopez about the show idea. The call lasted approximately 20-minutes and the two went into details of how the show would be created. **Lopez unequivocally wanted to proceed with Plaintiff's Medical Advocate show** and said that he would follow up with him during the next week.

181. Lopez mentioned that he would be seeing Mr. Giuliani at his radio studio in Rudy's home the next day.

182. Plaintiff then informed Lopez that he was not on good terms with Fox and that he suspected Fox might be causing Giuliani to give him the cold shoulder as part of the blacklisting campaign. He asked Lopez to discuss this with Giuliani, since Plaintiff was unable to reach him directly.

## Then, Radio Silence

183. After Mr. Lopez met with Giuliani, suddenly Lopez too began to ignore all attempts by Plaintiff to reach him as well. Prior to this, Mr. Lopez would answer his business phone when Plaintiff called even if he were in the middle of a meeting. Then, it all went radio silent, so to speak. Clearly, something was afoul and Plaintiff was not in the loop.

184. Now highly confident that Fox was blacklisting him still, a conspiracy going on for nearly a decade, Plaintiff drafted on June 11, 2020 a Cease and Desist email and sent it to Mr. Lopez so as to preserve evidence:

> Greer: "Chad Lopez, President, 77 WABC radio
>
> Mr. Lopez,
>
> The last time we spoke, which was last Friday, we had a lengthy discussion about The Medical Advocate radio show proposal. You expressed interest and said you would get back with me.
>
> I also informed you that Fox News was, once again, trying to blacklist me in media. I told you that Rudy Giuliani had suddenly gone from wanting to be my golf buddy, replying to phone and text messages, to seemingly blocking my phone number. I said that I suspected Fox smeared me with him, but I am speculating at this point.
>
> You said on Friday that you would see Rudy at his home Sunday. Since then, you too have gone from taking my calls, even when you are in the middle of a meeting, to not answering my calls or returning my messages.

> You are now complicit in this blacklisting defamatory conspiracy.
>
> **Cease and Desist your defamation**. Your hosts are to never mention my name in private or in public. You are to retain all emails and text messages. Failure to retain any documents could result in a ruling of adverse inference against you."

185. After that email was sent, Plaintiff received no invitations to be a guest on the WABC (770 AM) platform until Frank Morano left his AM 970 station job to work for WABC, to be explained more later.

186. **After weeks of silence, Mr. Giuliani decided to call Plaintiff** rather out of the blue. On June 28, 2020, he made no mention of his failure to reply to Plaintiff for weeks. Acting as if nothing had happened, he was calling Plaintiff seeking his advice on some large projects that he was mulling over. On the phone call, Giuliani stated:

> Giuliani: "This is Rudy Giuliani…I have an idea. I think that someone should organize a group around the notion of saving the American way of life.
>
> So, I am trying to figure out, what is the best thing to organize? I talked to (President Trump) about it. He can use it in his speeches.
>
> But should we try to organize something like the Tea Party movement?
>
> Or should we, I am going to put together a Roku channel with my podcast and my radio show…"

187. Giuliani wanted Plaintiff's help creating the Roku video channel and organizing a political action committee.

188. On the call, Plaintiff then thought of a tangible plan of action for Giuliani's broad-scoped fledgling concept. He suggested that they organize a large march on the Washington, D.C. Mall, with speeches at the monuments. Giuliani liked the idea and said that he would talk it over with people, presumably meaning the White House. The next day, he was at The White House giving interviews from the lawn by the West Wing.

189. Skeptical, thinking that Giuliani might not be truly sincere about his interest in doing large national events with him, Plaintiff sent a text message on June 30th that stated:

> Greer: "Can we follow up today? I don't want to waste any more time if you think it is not feasible. Conversely, if you think we can do it, we need to set up a small virtual office and website like a PAC"
>
> Giuliani: "Getting ready for air"
>
> Then, later on June 30th, Rudy sent an Internet meme comedy image to Greer, again indicating that the two men were still working together.

190. The next day, Plaintiff came up with a second plan of action that could be achieved more easily in Giuliani's own backyard. On July 1st, Plaintiff sent a text to Giuliani explaining that the low-hanging fruit would be to form an effort to remove the highly unpopular Mayor de Blasio by using large rallies and legal action. Governor Cuomo had already suggested that he had the authority to remove Mayor de Blasio by the powers granted to him in the state charter.

191. Plaintiff, still being skeptical, knowing it was quite possible that Giuliani simply called this second time to appease him after learning Plaintiff was accusing WABC and Giuliani of blacklisting him, gave Giuliani yet another opportunity to be let off the hook.

192. For example, on July 3rd, 2020, Plaintiff wrote in a text message:

> Greer: "Let's put closure on these ideas. Do you want to do them or no?"
>
> Giuliani: "I like dumpling DB" [sic] (He meant to write that he liked Greer's idea of forming a committee to oust or "dump" Mayor de Blasio)

193. However, after July 3rd, and for no discernable reason, Rudy Giuliani went radio silent on Plaintiff for a second time.

194. Purely speculating at this time until more evidence is flushed out, Plaintiff suspects that a draft of this legal complaint, which was accidentally sent on July 2nd to a famous

lawyer who also represents President Trump, was unethically leaked to Giuliani.

195. Since that time of Plaintiff giving Mr. Giuliani his ideas, Giuliani has proceeded to use Plaintiff's ideas. Giuliani has made numerous media appearances pounding the table for the ouster of Mayor de Blasio, which was Plaintiff's idea, in part. Rudy has been active on Twitter. As just one example of many, on July 11, 2020, Giuliani tweeted that Mayor de Blasio should be removed (screenshot image below):




## <u>More obstruction by WABC (770 AM)</u>

196. On June 19, 2020, after Frank Morano sent an email announcing that he was leaving AM 970 to work for WABC (770 AM), Morano emailed Plaintiff about his intention to use him once he got settled in:

> "I'm planning to have you on often and suggest you for some other shows as well as your own show there."

197. However, nothing materialized after weeks of Morano starting work at WABC. Suspecting that the backlisting was the reason, Plaintiff pressed the issue. To his credit, Morano then tried to get Plaintiff on his show. It was the slow week after July 4th and he was filling in for the *Bernie & Sid* show, which is primetime morning radio.

198. However, Morano was unsuccessful at obtaining permission to have Plaintiff on his show at WABC. Instead, he had him on[38] at 11:00 AM, July 8th, on his other radio station job at WLIR (owned by the same man as who owns WABC).

199. Plaintiff asked what happened and Morano replied:

> "Chad (Lopez) usually doesn't get involved in day to day interviews. But the PD (programming director Dave LaBrozzi) assured me that you're not banned from the station at all and we're able to have you on whenever we want. Not sure why the Producer scrapped you. I'm just a fill-in. I didn't feel it was my place." (content in parentheses added for clarity)

200. But the actions by the managers at WABC do not match their empty assurances. No one has contacted Plaintiff about his idea for the *Medical Advocate* show and no one has reached out to have him on as a guest.

## **Even Joe Piscopo has been chilled**

201. Meanwhile, back at AM 970 and *The Joe Piscopo Show*, with producer Frank Morano gone, having moved to WABC, now even Joe Piscopo, a documented super-fan of Plaintiff, seems to have been chilled from using Plaintiff as a guest for many weeks until this complaint was filed. Of note, Mr. Piscopo appears on Fox News, is working on his own Fox Nation show, and has friendships with Fox talent.

202. In summary, at the time of this filing, Plaintiff's radio career has abruptly flatlined for no known reason. Only Frank Morano has been willing to continue relations with Plaintiff creatively using the venue of his late-morning WLIR time slot that few tune in to listen. Joe

---

[38] https://greerjournal.com/frank-morano-of-WABC (770 AM)-interviews-steven-e-greer-md-july-8-2020/

Piscopo seems to have been chilled, and the entire WABC station has refused to air Plaintiff despite Morano requesting him to be a guest. Blacklisting is the presumed explanation.

## Unauthorized Use of Greer's Work

### Tucker Carlson "The Serial Plagiarist"

203. When Tucker Carlson was given the 8:00 PM slot on Fox News in 2018, Plaintiff began watching. However, he soon spotted commentary on Carlson's opening monologue segment that was suspiciously similar to essays Plaintiff had written on his *BatteryPark.TV* news site (now renamed as *GreerJournal.com*) and then published in his book *Rules to Stop Radicals*. As detailed above, Carlson was in possession of the book and received Plaintiff's blast emails with links to his essays.

204. Plaintiff suspected that he was the victim of copyright infringement[39] and unfair competition. In 2019, he began to warn Carlson and his producer, Justin Wells, after they stole a Plaintiff story about Jeffrey Epstein.

#### The Jeffrey Epstein story

205. When Plaintiff lived in New Albany, Ohio from 2018-19, he was living in a community built in the early 1990's by *L Brands* CEO Les Wexner and convicted pedophile Jeffrey Epstein. Epstein and Wexner's palatial 400-acre estates were nearby.

206. Plaintiff noticed the early rumblings on the Internet that Wexner was one of Epstein's associates and that the old pedophile charges on Epstein might resurface. This was long before the mainstream media was reporting on it.

[39] Pandemic delays with the copyright office and the lack of an official registration of *Rules to Stop Radicals* prohibit at this time a copyright infringement cause of action.

207. Plaintiff's college diplomas are signed by Les Wexner and Wexner's name is on his medical school buildings. Disgusted by this, Plaintiff began a mission to oust Wexner from his *alma mater*.

208. Therefore, following closely the Epstein scandal was a priority. Plaintiff become one of the first people in the country to correctly predict the events that transpired.

209. Specifically, Plaintiff was the first person in the media to state that the description of Epstein lazily being used by the media as he being a wealthy "hedge fund manager" was a merely a ruse. He also predicted that it would turn out that much of Epstein's wealth, including his Manhattan mansion and private jet, really came from Wexner. That was a novel comment no one else had made, to Plaintiff's knowledge. He was proven clairvoyant.

210. On Friday, July 13, 2019, Plaintiff emailed Charlie Gasparino, Brian Jones, Tucker Carlson, Justin Wells, Tom Burton of the Wall Street Journal, and Charles Herring of OANN with this tip:

> Greer: "http://nymag.com/intelligencer/2019/07/hedge-funders-have-some-thoughts-on-what-epstein-was-doing.html
>
> NY Mag story doing exactly what I did, which was to call around broker dealers and see if they have ever heard of Epstein. It is all just like Madoff. He had a fake hedge fund and was laundering money.
>
> I now am quite certain there is only one person wealthy enough, who is connected to Epstein, to do this, and that I Les Wexner."

211. Note that the New York Magazine story in the URL above does not state that Epstein's wealth is all derived from Les Wexner. That was Plaintiff's novel deduction based on Wexner's name being listed in the "little black book" kept by an Epstein employee that was part of 2008 legal filings. While many others might have thought this to be the case, Wexner was still

too powerful at the time for the press to openly associate Wexner with Epstein.

212. Only Gasparino replied to Plaintiff's email claiming he had already known about it for three-months but somehow failed to report it on the air.

> Gasparino: "I wrote three months ago he didn't run a hedge fund again get me something new" [sic]

213. Note how Gasparino expected Plaintiff to do work for him by stating, "get me something new". He also failed to detail where he supposedly wrote about this scoop months before, and why he failed to go on the air with it when he normally has such low standards for blabbering on the air with unsubstantiated "sources say" stories.

214. Plaintiff replied to the Gasparino email reply by calling him a liar.

215. Over that weekend, Plaintiff sent text messages with the same tip to Tucker Carlson and his producer Justin Wells. Mr. Wells replied.[40]

216. On the following Monday, July 15, 2019, Tucker Carlson made Plaintiff's story his prominent topic of the episode. He interviewed Fox Business' Melissa Francis who reiterated Plaintiff's tip almost verbatim. She even mentioned the highly specific comment that Epstein's private jet likely came from Wexner's estate. The jet detail was a novel observation made by Plaintiff and disclosed to the aforementioned. No one in the media, including Fox, had mentioned these comments before.

217. On July 16, 2020, Plaintiff sent a text message Carlson. Then, Tucker Carlson made the bizarre response via text message pretending to be a junior producer at Fox named Chris Wallace:

> "**<u>This is Chris Wallace</u>**. Please stop sending me right wing propaganda" (emphasis added)

[40] Greer cannot locate records in his files of this text message but they can be produced during discovery

218. That cell phone number has since been confirmed by a security expert as belonging to Tucker Carlson. There is no doubt that Carlson was impersonating another Fox employee. Chris Wallace is a Fox producer who used to work with Plaintiff when he did work for Fox Business.

219. Plaintiff documented this exchange as part of a letter to the Fox legal department, detailed below.

220. On July 25, 2019, Plaintiff emailed and sent text messages to Carlson and Wells requesting contact information for Fox legal department for him to send a legal "cease and desist" They did not provide any response to the request.

221. On July 29, 2019, Plaintiff sent a legal letter to Carlson, Wells, and in-house lawyers working for Fox (Ex. G). Lily Claffee, head of Fox legal, received and read the email, yet no one replied.

**The use of Greer's novel term "Demplosion"**

222. In January and February of 2019, Plaintiff created the novel term "Demplosion" and documented it in a series of essays.[41,42] Plaintiff re-posted the essays on the front page of his BatteryPark.TV in July of 2019. He also made the essay part of his copyrighted *Rules to Stop Radicals* book.

223. Google search reveals that the term demplosion had only been used before by a blogger back in 2010. Plaintiff was unaware of that when he also came up with it. Demplosion was not an obvious or ubiquitous term.

224. Then, on July 30, 2019, Tucker Carlson led off his show with a large graphic over

---

[41] https://greerjournal.com/essay-the-great-demplosion-of-2019/
[42] https://greerjournal.com/the-demplosion-accelerates-alexandria-ocasio-cortez-causes-amazon-to-back-out-on-nyc-deal-costing-30000-jobs/

his shoulder that stated "DEMIMPLOSION" He seemed to have inserted the letter "I" to make it different from Greer's (see exhibit photo below).




225. Google search reveals that the term had only been used before in 2010 by an obscure blogger. Plaintiff was unaware of that when he also came up with the term. Demplosion was not an obvious or ubiquitous term. It was used in a unique way by Plaintiff.

226. Moreover, the single phrase of demplosion was not the only part of Plaintiff's essay that was copied by Carlson. His entire monologue mirrored Plaintiff's essays about the Democrat party making mistakes that would cause them to lose badly in the next elections. Those monologue comments, along with the "Demiplosion" graphic, would be viewed by the casual observer to be so similar as to be confused with Plaintiff's original works.

227. Plaintiff promptly posted a story on his website that evening with the title, "Tucker Carlson rips off BPTV again" and sent it to his usual blast email list. He also sent it to Fox's Lily Claffee, *et al*. They received it and, once again, did not reply.

228. The Carlson use of Plaintiff's Demplosion occurred just one day after the July 29th "cease and desist" email sent, above. He seemed to have been thumbing his nose at Plaintiff

in a malicious and willful manner.

229. On August 1, 2019, Plaintiff noticed in his Microsoft Outlook program an "email was read" notice from a person named Clifford Cid. A Google search revealed that the man runs the security efforts for Fox. Therefore, rather than reply to Plaintiff's legal letters, Fox instead defamed Plaintiff further by putting him on a security watch.

230. On August 1st, 2019, Plaintiff sent another email to Brian Jones, Lily Claffee, and Clifford Cid:

> "Your slanderous actions continue. You have your head of security, Cid Clifford, following me now. I have asked your legal department to contact me and they have ignored me. I have also sent Justin Wells and Tucker Carlson cease and desists, and they continue to steal my content."

231. **Clearly, the *modus operandi* at Fox is to immediately smear opponents by triggering malicious and frivolous security actions rather than deal with complaints properly**. It is a culture established by Roger Ailes. This is likely why numerous lawsuits against Fox have been settled for tens of millions of dollars, major on-air personalities have been fired, and Fox News is the butt of jokes by the rest of mainstream media.

232. Seven-months later, on February 18, 2020, Carlson used the term "Demimplosion" again (see below).




**The use of Greer's unique phrase "Civil War"**

233. After the August 1, 2019 legal emails, Plaintiff continued to email Fox defendants new material that he posted on his news site in order to put them on notice that the work had been published and was protected.

234. Two years prior, on October of 2017, Plaintiff began making the novel analogy that the partisan division in the country was actually a genuine second civil war, literally.[43] No one else in the mainstream media, to Plaintiff's knowledge, was stating this. It was an original use of words by Plaintiff because he was applying it to modern events when no one else was doing so.

235. On August 3, 2019, Plaintiff recirculated via blast email the various essays that had used "civil war" in the title. Carlson, Wells, and others at Fox received the emailed essays.

236. Then, just as Plaintiff had predicted to friends, on August 7, 2019, Tucker Carlson, for the first time to Plaintiff's knowledge, used the words "civil war" to describe the national unrest. He used the term in the same unique way that Plaintiff had used it, infringing on

---

[43] https://greerjournal.com/the-united-states-just-entered-into-a-second-civil-war/

copyright yet again and misappropriating Plaintiff's work.

237. On August 8, 2019, Plaintiff posted the story titled, "As predicted, Tucker Carlson rips off our "Civil War" analogy"".

238. Then, that evening, Tucker Carlson abruptly stopped hosting his show. His absence was not explained. Plaintiff posted a story[44] speculating whether or not his legal letters had prompted Fox to reprimand Carlson with a "time out" off the air.

**<u>The use of Plaintiff's unique observations about the pandemic</u>**

239. As detailed above, Plaintiff literally became the leading voice in the entire nation at observing major stories playing out in the Wuhan virus epidemic. Notably, he was the first person to state that the high death rates in New York were not in line with the rest of the country and were caused by incompetent healthcare delivered by hospitals in poor parts of the city where competent doctors and nurses did not want to work.[45] Plaintiff suspected this based on firsthand experience having worked in them decades ago as a surgery resident. He took heat for this pioneering opinion too. At the time, hospital workers were lionized in the media only as heroes (and the vast majority of the healthcare providers indeed were risking their lives and were true heroes).

240. As the pandemic and data carried on, Plaintiff's assertion became fact. On July 1, 2020, the New York Times published a lengthy investigative report confirming Plaintiff's hypothesis.[46]

241. On April 19, 2020, Plaintiff wrote the essay, "Coronavirus is a New York

[44] https://greerjournal.com/tucker-carlson-takes-vacation/
[45] Joe Piscopo Show transcripts (Ex. C)
[46] "Why Surviving the Virus Might Come Down to Which Hospital Admits You" The New York Times. July 1, 2020. https://www.nytimes.com/2020/07/01/nyregion/Coronavirus-hospitals.html?action=click&module=Top%20Stories&pgtype=Homepage

problem, not a national problem".[47]

242. Plaintiff's essay stated:

> "**The mainstream media is clustered inside the Manhattan Bubble**, where there is no hint of a lifting of the home-quarantine orders, and will be spewing more and more opinion pieces aimed at making the rest of America seem like hayseed country bumpkin morons for going back to normality. Are they correct or are they misguided and dishonest?
>
> The dirty little secret that everyone knows inside Cuomo's offices in Albany, Manhattan hospital board rooms, and City Hall is that **the high death rate is being generated from focal hot spots within Queens and other outer boroughs** where Third World conditions have existed for centuries. **This is not a national pandemic** worthy of shutting down the global economy. This is a New York problem that can be further isolated as a problem of hot spots within Queens, etc."

243. Then, on April 24, 2020, Tucker Carlson copied Plaintiff's unique observations.[48] Carlson's television monologue stated:

> "Why are the numbers so skewed toward the urban Northeast? ….but for now, what's clear is that this virus is concentrated not simply in a handful of states, but in a small number of places, especially Southern New York, in and around **New York City…possibly because these are also the places where most of our national media figures live, the pandemic often seems like a nationwide disaster**."

244. In response to the clear plagiarism, copyright infringement, and misappropriation by Carlson, Plaintiff posted the story, "Serial plagiarist Tucker Carlson ripping off my essay about the virus being a unique NY problem"[49] on the same evening.

---

[47] https://greerjournal.com/coronavirus-is-a-new-york-problem-not-a-national-problem/
[48] https://greerjournal.com/serial-plagiarist-tucker-carlson-ripping-off-my-essay-about-the-virus-being-a-unique-ny-problem/
[49] https://greerjournal.com/serial-plagiarist-tucker-carlson-ripping-off-my-essay-about-the-virus-being-a-unique-ny-problem/

245. Of note, a few days before, on April 16, 2020, Plaintiff posted the story, "Serial plagiarist Tucker Carlson plagiarizes the phrase "serial plagiarist"".[50] As the title implies, Plaintiff coined the nickname for Carlson of, "The Serial Plagiarist". Then, perhaps to spite Plaintiff, Carlson actually plagiarized the term "serial plagiarist" by using the term on his show.

246. On May 1, 2020, Plaintiff emailed Carlson, Wells, and others:

> "**Please have your lawyers contact me**. You are a serial plagiarist. I am forced to memorialize my innovative content my sending it to you as a copyright notice." (emphasis added)

247. As was the case in previous requests, Fox ignored the request.

**<u>And other examples</u>**

248. In his *Rules to Stop Radicals*, Plaintiff has published several essays describing the turmoil in the nation as literally being another Bolshevik Marxist revolution. Whenever nations have unrest and people are unhappy, communism rears its ugly head.

249. No one in the media, to Plaintiff's knowledge, was willing to associate the rioting and looting in the streets to a Marxist revolution, presumably for fear of the backlash and being smeared as engaging in McCarthyism. It was a novel use of words by Plaintiff.

250. On June 5, 2020, Tucker Carlson led off his show using Plaintiff's unique observation. He explained how the anarchists and rioters were using similar tactics that Lenin's Bolshevik party used in 1917. However, he carefully avoided using the actual term "Bolshevik" He only referenced "Lenin", possibly as a thinly-veiled attempt to avoid liability.

251. On June 11, 2020, Plaintiff emailed Carlson yet another "cease and desist":

[50] https://greerjournal.com/https-youtu-be-qp-zg8e4vdc/

> Greer: "Cease and Desist
>
> Mr. Carlson,
>
> I saw your segment tonight with the Insider nurse exposing how egregiously incompetent care at Elmhurst Hospital directly led to infections and death. You even discussed the concept of medical advocacy by family, which is in my book the Medical Advocate.
>
> As you well know, I was the first person months ago to say in the national media and on my own website that the high death rates were due incompetent care at these hospitals. I even called the CEO of Elmhurst and spoke with him. I gave you his contact.
>
> I'm glad you are covering this. Unfortunately for you, you have a legal obligation to mention that this was my story. It is also basic journalistic ethics."

252. The aforementioned examples of Tucker Carlson using Plaintiff 's unique expressions as his own is not comprehensive. Other examples exist.

253. Why might Tucker Carlson have engaged in such reckless behavior despite repeated warnings? Who actually rights the words that Carlson reads from the Teleprompter?

254. Blake Neff was Carlson's senior show writer until July 13, 2020. Neff stated in Dartmouth Alumni Magazine, "**Anything [Carlson is] reading off the teleprompter, the first draft was written by me**."" [51]

255. Neff was fired after CNN exposed secret online comments that he posted under an alias whereby he expressed racist and misogynistic comments. He also alluded to a problem with alcoholism.[52]

256. **This pattern of plagiarism and copyright infringement by Carlson, detailed**

[51] https://dartmouthalumnimagazine.com/blake-neff-tucker-carlson
[52] https://www.cnn.com/2020/07/10/media/tucker-carlson-writer-blake-neff/index.html

**above, is consistent with a personally troubled senior writer, such as Neff**.

## First Cause of Action

**Unfair Competition** by misappropriation
(common law)

257. Plaintiff repeats, re-alleges, adopts and incorporates each and every allegation contained in Paragraphs 1 through 256, inclusive as though fully set forth herein.

258. All of the Fox-related defendants have misappropriated Plaintiff's labor for more than a decade. Defendants were made aware of Plaintiff's work either by email, SMS text message, and/or telephone communications.

259. When Plaintiff provided ideas and labor to Defendants, an implied in-fact contract was created.

260. The Fox-related defendants knew that plaintiff expected compensation and offered him a work contract. Plaintiff rejected the contract offers and then Defendants recruited him back to their TV shows. Plaintiff continued to provide the efforts of his labor expecting future contract negotiations.

261. However, Plaintiff was the victim of a misappropriation scheme perpetrated by Brian Jones and the other Fox News defendants (Tucker Carlson, Justin Wells, Blake Neff, and the Fox corporate entities).

262. Brian Jones ran the Fox Business Network until late 2019. Charlie Gasparino was an employee under Jones' management responsibility. Jones was well aware that Plaintiff was communicating stories and tips to Gasparino and others.

263. Lachlan Murdoch and Suzanne Scott were the two senior-most managers of the Fox corporate entities. Plaintiff sent legal warnings to the heads of those in-house legal departments. Murdoch and Scott either knew about the allegations made by Plaintiff or should have known.

264. Moreover, Murdoch and Scott were well aware of troubles emanating from the

Tucker Carlson show. They had a fiduciary duty to have investigate Carlson and his staff better than they did. The scandals that led to the firing of Blake Neff were not unpredictable. Carlson has been disciplined by Fox several times and there have been numerous boycott campaigns of his show.

265. The Cult of Roger Ailes at Fox that led to the scandals and Ailes' firing was never eradicated by Scott and Murdoch. There should be accountability at the top of those organizations once and for all.

266. Defendants Tucker Carlson, Justin Wells, and the Fox corporate entities were repeatedly sent "cease and desist" warnings to stop misappropriating Plaintiff's work, and yet they continued to do so. No one from the Fox legal departments ever contacted Plaintiff despite numerous requests.

267. Defendants intentionally misappropriated Plaintiff's work as their own for the dishonest purpose of deceiving their own viewers into believing that they were clever enough to have created the news content.

268. In bad faith, Defendants misappropriated the labors and expenditures of another person, i.e. Plaintiff Steven E. Greer. This long pattern of intentional and dishonest misappropriation constitutes unfair competition.

269. Plaintiff has been harmed by the unfair competition. Rather than being recognized in the national media for his important scoops and novel observations, his stolen work has caused millions of Fox viewers to believe that Fox created Greer's content on their own. Had Plaintiff been given credit over the years by Defendants, he likely could have had a thriving media business. Instead, Plaintiff earns no income from his journalism and media work despite being highly regarded.

270. This pattern of unfair competition should be punished with punitive and actual damages. It is an industry-wide problem that stifles journalism creation from smaller news operations. Because large studios know that small content creators cannot afford the litigation, and few law firms will take such cases on a contingency basis, the big bullies, such as Fox, have gotten away with their crimes.

## Second Cause of Action

**Misappropriation of "hot news"**
(common law)

271. Plaintiff repeats, re-alleges, adopts and incorporates each and every allegation contained in Paragraphs 1 through 256, inclusive as though fully set forth herein.

272. When the Fox-related defendants used Plaintiff's original scoops, they violated the New York common law tort of "hot news misappropriation".

273. In the Tucker Carlson section above, a prime example of this is the use of, without permission or credit, Plaintiff's exclusive story about the true origins of Jeffrey Epstein's wealth. Brian Jones likely forwarded Plaintiff's email tip to his employees at Fox Business Network, Fox New, and Tucker Carlson, becoming complicit on the misappropriation.

274. Plaintiff generates or gathers information at a cost, the information is time sensitive, Defendant's use of the information constitutes free-riding on the Plaintiff's efforts, the defendant is in direct competition with a product or service offered by Plaintiff, and the ability of the Defendants to free-ride on the efforts of Plaintiff reduces the incentive to produce the product so that its existence or quality is substantially threatened.

275. More on that last point of Fox threatening the existence of independent journalism, such as that created by Greer, real journalism has been nearly extinguished by several factors. One factor is large media conglomerates, such as the Fox and News Corp defendants, stealing the work of smaller news outlets. This process needs to stop and the bad actors punished harshly.

276. When federal copyright law protection is not available, the "hot news doctrine" survives.

## Third Cause of Action

**Unjust Enrichment**
(common law)

277. Plaintiff repeats, re-alleges, adopts and incorporates each and every allegation contained in Paragraphs 1 through 256, inclusive as though fully set forth herein.

278. Plaintiff and the Fox-related defendants had a long relationship. Brian Jones recruited Plaintiff in 2008 to be on his newly launched Fox Business Network. Charlie Gasparino had used Plaintiff's story scoops and work since 2010.

279. Lachlan Murdoch and Suzanne Scott were in charge of those corporate entities. They knew about Plaintiff's contributions to their companies because they participate in daily production meetings and watch the TV monitors when guests, such as Plaintiff, are on Fox News or Fox Business.

280. Plaintiff was encouraged to provide the Fox-related defendants his valuable creative work with expectations of being rewarded by credit for his work and payment. Offers of employment had been made. An implied in-fact contract existed.

281. The Fox-related defendants benefitted for years from Plaintiff's high-quality newsworthy content.

282. Plaintiff's content is created at an expense to him in time, effort, and actual costs.

283. A reasonable jury would find it equitable for Plaintiff to be compensated just as other journalists and creative content creators are compensated by media companies.

284. Because of the above conditions in this case, Defendants are liable for unjust enrichment.

## Fourth Cause of Action

**"Blacklisting"**
**(**Tortious Interference with Contractual Relations,
Tortious Interference with Prospective Economic Advantage (both common law),
and Injury to Business Reputation (NY Gen Bus L §360-L (2012)))

285. Plaintiff repeats, re-alleges, adopts and incorporates each and every allegation contained in Paragraphs 1 through 256, inclusive as though fully set forth herein.

286. While no state statutes exist specifically to address "blacklisting", to the best of *pro se* Plaintiff's knowledge, tortious interference applies.

287. When a creative content creator like Plaintiff pitches ideas to a studio, such as the Fox-related Defendants or the radio stations discussed above, an implied in-fact contract is created between the creator and the larger media company. Expectations exist for compensation and/or credit being given to the creator. Therefore, the common law of tortious interference with contractual relations applies to this case.

288. Should this Court disagree that an implied in-fact contract had been established, then the different common law of tortious interference with prospective economic advantage applies.

289. In the Charlie Gasparino sections above, he clearly states in writing, multiple times, that Plaintiff has been blacklisted by the Fox-related and News Corporation-related defendants. He stated that Plaintiff was not allowed into their corporate building and that he had been banished to Siberia.

290. Evidence supporting Gasparino's claims is the incident in 2013 when GMSC Security held up Plaintiff and did not allow him to pass on to the Fox studios. Brian Jones admitted to Plaintiff that the News Corporation defendants (News Corp, Dow Jones, The Wall Street Journal, Gerard Baker, Jennifer Strasburg) had placed his name on a computer list of people to not admit into the building. Plaintiff was told by Jones that it was his interactions with Jennifer Strasburg and Gerard Baker that led to the blacklisting. Yet no one has ever explained to Plaintiff what exactly he did to deserve being placed on such a defamatory list. That is because

there was and is no good justification for it.

291. In other sections above, circumstantial evidence shows that Defendants are still engaging in this backlisting by chilling radio stations from using Plaintiff as a guest, and refusing to promote Plaintiff's books. The recent sudden demise of Plaintiff's radio career is just the latest example of harm done to Plaintiff from Defendants' backlisting conspiracy.

292. In addition, Plaintiff's two books were hindered from reaching the mainstream market when the Fox-related defendants refused to promote them, as part of the blacklisting.

293. Consistent with the very nature of blacklisting, Plaintiff has circumstantial evidence other media companies that are not part of the defendant list were chilled away from Plaintiff. There is no other likely explanation for One America News Network, for example, not assisting Plaintiff with book promotions or using him repeatedly as an expert guest on the pandemic. As another example, there is no other likely explanation for the head of WABC (770 AM) radio station to have suddenly done a 180-degree reversal from planning to have Plaintiff run his own show to going radio silent on him.

294. Plaintiff should have a thriving multi-media empire, similar to Howard Stern's or Rush Limbaugh's, for examples. The loss in value to Plaintiff caused by the malicious actions of Defendants is no less than $1 Billion, based on the market value of similar media companies and the net worth of those owners.

## Fifth Cause of Action

**Defamation**
(common law)

295. Plaintiff repeats, re-alleges, adopts and incorporates each and every allegation contained in Paragraphs 1 through 256.

296. New York courts have recognized *per se* defamation to be comments made to a third party that tend to injure another in his or her trade, business, or profession.

297. Defendants' actions to place Plaintiff's name in their computer system, for any number of their employees to read, which caused Plaintiff to be publicly embarrassed in the lobby of the Fox/News-Corp headquarters, destroyed Greer's television career. It was malicious and grossly negligent of them to be blindly complicit with the Fox and News Corp blacklisting conspiracy.

298. Plaintiff had made no threats of violence or posed any sort of security risk to anyone in the building. The fact that Brian Jones waved Greer past the security desk to come up to the studio for a Fox Business filming, overriding the orders posted on the lobby computer screen, is supporting evidence of Plaintiff's lack of any threat.

299. Jennifer Strasburg was the originating source of the defamation against Plaintiff relating to the 2013 lobby security matter. Her boss, Gerard Baker, was made aware of it and did nothing to remove the computer blacklist of reverse the damages, making him liable. Baker and Strasburg work for the News Corp group of corporate defendants (i.e. WSJ, Dow Jones). The computer blacklist is still on the GMSC security systems to this date, Greer believes based upon his recent attempts to get his books mailed past the security screening step, thus making it an ongoing act of defamation.

300. Likewise, the actual blacklisting conspiracy has stomped out Plaintiff's multi-media career, destroying hundreds of millions of dollars in potential value, thus constituting *per se* defamation.

301. Likewise, when Defendants made false police reports to the Federal Bureau of

Investigations, as Gasparino claimed in his emails to Greer, they committed *per se* defamation (as well as intentional infliction of emotional distress).

302. Those examples are just the tip of the iceberg. During discovery, it is likely that it will become known that Tucker Carlson, Brian Jones, Justin Wells, Gerard Baker, and many others have all smeared Plaintiff to the point of banishing him to the Siberia of the media world, as Gasparino stated.

303. In addition to *per se* defamation, regular defamation was committed. Plaintiff suffered special economic damages.

## Sixth Cause of Action

**Intentional Infliction of Emotional Distress**
(common law)

304. Plaintiff repeats, re-alleges, adopts and incorporates each and every allegation contained in Paragraphs 1 through 256.

305. Charlie Gasparino threatened Plaintiff via email with the ominous force of the Federal Bureau of Investigations and claimed that his supervisors were routinely updating the FBI on Plaintiff's actions.

306. The head of security for Fox-related defendants, Clifford Cid, was monitoring emails from Plaintiff to Fox legal. Greer's name had been placed in the security computer system for the lobby staff to bar him from entering the building. Plaintiff's books mailed to the Fox building were not allowed past the mail room security screening process.

307. All of this is evidence that Defendants were in fact leveraging relationships with active FBI and retired police who work for security companies in order to cause emotional distress to Plaintiff. They committed the tort of intentional infliction of emotional distress.

308. That allegation is based on emails sent from Charlie Gasparino to Greer, *inter alia*. However, even if that is not what actually happened, and Gasparino was merely bluffing as the blowhard that he is, then Gasparino still intentionally inflicted emotional distress upon Plaintiff out of anger during an email spat. As a result of the Gasparino threats, Greer has spent hundreds of hours preparing this complaint, among other things, due to the emotional distress.

# Relief

**WHEREFORE**, Plaintiff Steven Greer prays for the following:

A. Damages, including general and special damages, in an amount not less than **$1 Billion ($1,000,000,000)**, to be determined at trial;

B. Punitive damages;

C. Restitutionary disgorgement;

D. An order enjoining Defendants from engaging in further retaliatory conduct toward Dr. Greer;

E. An injunction requiring Defendants to cease engaging in unfair competition;

F. An injunction requiring Defendants to announce publicly on their media platforms that they have been using Plaintiff's work without giving him credit;

G. An injunction requiring Defendants to promote Plaintiff's books and other works on their media platforms;

F. Prejudgment interest;

G. Costs to the extent provided for by law, including attorney's fees as provided by statute; and

H. An order awarding Dr. Greer such other and further relief as the Court deems just and proper.

Signed this 12th day of August, 2020

Steven Greer

Steven Greer
7029 Maidstone Drive
Port Saint Lucie, Florida 34986
(212) 945-7252
Steve@GreerJournal.com