**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **Steven E. Greer** | ) | |
| | ) | |
| Plaintiff; | ) | **1:20-cv-05484** (LTS)(SDA) |
| | ) | |
| v. | ) | |
| | ) | |
| **Tucker Carlson,** | ) | |
| **Fox Corporation,** | ) | |
| **Fox News Media,** | ) | |
| **Fox News Network LLC,** | ) | |
| **Lachlan Murdoch,** | ) | |
| **Suzanne Scott,** | ) | |
| **Justin Wells,** | ) | |
| **Blake Neff,** | ) | |
| **Charles Gasparino,** | ) | |
| **Fox Business Network,** | ) | |
| **Brian Jones,** and | ) | |
| _____ | ) | |
| | ) | |
| **News Corporation,** | ) | |
| **Dow Jones,** | ) | |
| **The Wall Street Journal,** | ) | |
| **Gerard Baker,** | ) | |
| **Jennifer Strasburg** | ) | |
| _____ | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

PLAINTIFF'S
MEMORANDUM of LAW in OPPOSITION
of MOTION to DISMISS

# Contents

Brief Review of the Case ............................................................................................- 4 -

Tucker Carlson is Not Domiciled in Florida ............................................................- 5 -

   Carlson Does Not Intend to Return to Florida When He Leaves ...........................- 5 -

   Carlson's "Course of Conduct" Does Not Support Florida Domicile ....................- 8 -

   Carlson Has Not Abandoned His Northeast Domiciles ......................................- 11 -

   The Totality of Evidence is Against Carlson Domiciled in Florida .....................- 12 -

Jennifer Strasburg is Not Domiciled Abroad ........................................................- 13 -

   Strasburg Has Not Abandoned United States Domicile .......................................- 14 -

   Strasburg's Behavior Has Been One of an American-Domiciled Person ............- 14 -

   Strasburg Intends to Return to Her United States Domicile .................................- 15 -

   Strasburg's Assignment Abroad is Common for U.S. Domiciled People ............- 16 -

Plaintiff is Domiciled in Florida ............................................................................- 17 -

   Plaintiff Plans to Return to Florida When He Leaves .........................................- 17 -

   Plaintiff's "Course of Conduct" Supports Florida Domicile ...............................- 18 -

   Plaintiff Has Abandoned New York Domicile ....................................................- 20 -

This Court Has Authority to Sever Non-Essential Parties.....................................- 21 -

Summary..................................................................................................................- 21 -

Compliance .............................................................................................................- 22 -

# Cases

*Chevalier v. USA Exp. Moving & Storage Inc.*, No. 03-CV-09059 (PKL), 2004 WL 1207874, at *2 (S.D.N.Y. June 2, 2004) ........................................................................... - 8 -, - 9 -

*Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 68 (2d Cir. 1990) ......................................- 13 -

*Grupo Dataflux v. Atlas Global Grp., L.P.*, 541 U.S. 567, 582 (2004) ....................................- 21 -

*Korb v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 03-CV-10333 (CSH), 2006 WL 300477, at *1 (S.D.N.Y. Feb. 7, 2006) ........................................................................- 8 -, - 18 -

*Linardos v. Fortuna*, 157 F.3d 945, 947-48 (2d Cir. 1998) ......................................................- 9 -

*Pacho v. Enter. Rent-A-Car*, 510 F. Supp. 2d 331 (S.D.N.Y. 2007) ................. - 11 -, - 13 -, - 20 -

*Palazzo* v. Corio, *232 F.3d* 38, 42 (2d Cir. 2000) .............................................................- 5 -, - 13 -

*Seales v. Panamanian Aviation Co.*, No. 07-CV-02901 (CPS) (CLP), 2009 WL 395821, at *7 (E.D.N.Y. Feb. 18, 2009) .................................................................... - 13 -, - 14 -, - 16 -

*Sun Printing & Publ'g Ass'n v. Edwards*, 194 U.S. 377, 383 (1904).........................................- 5 -

*Van Buskirk v. United Grp. of Companies, Inc.*, 935 F.3d 49, 53 (2d Cir. 2019)......................- 9 -

Plaintiff Steven E. Greer opposes the defendants' motion to dismiss (MTD). Plaintiff is represented *pro se* in this complaint.

# Brief Review of the Case

This case was initiated on July 14, 2020 with a complaint alleging blacklisting and misappropriation of Plaintiff's literary and media appearance works. Defendants filed their motion to dismiss ("MTD") on September 18th (ECF 46) based on the argument that Plaintiff lacked diversity as subject matter for jurisdiction. They claimed that defendant Tucker Carlson is domiciled in Florida, where Plaintiff is as well, and that defendant Jennifer Strasburg was domiciled in the United Kingdom. Therefore, they argue that the case should be dismissed. Plaintiff refuted those factual claims and was granted jurisdictional discovery to prove the exact whereabouts and criteria for domicile required by the defendants.

After a contentious discovery process in which the defendants failed to initially provide the documents ordered by this Court (ECF 86), Plaintiff now proves by a preponderance of the evidence that Defendants' claims of domicile are untrue. Tucker Carlson has not abandoned the Northeast metropolitan lifestyle and domiciles he has used for decades (which are required for him to perform his job as a cable TV show host) in favor of a small vacation house recently purchased in ████████████████. Likewise, Jennifer Strasburg has not abandoned her United States life and domicile. She has been merely assigned by her employer to report from London. Therefore, the MTD should be denied.

- 4 -

# Tucker Carlson is Not Domiciled in Florida

One argument for the MTD is that Tucker Carlson's domicile, allegedly now in Florida, is not diverse from Plaintiff's, who is also domiciled in Florida. (Greer Decl. ¶¶ 1-15) Therefore, the requirements for diversity subject matter are not met and this Court lacks jurisdiction. However, those claims have been proven to be false after a jurisdictional discovery process.

Tucker Carlson has not met the case law requirements for domicile in the State of Florida as set out by the decision from this Court (ECF 86). First, his pattern of living outside of Florida since buying the vacation home in Florida early this year demonstrates that he does not plan on returning to Florida full-time when he leaves that house. Secondly, Carlson has not abandoned his Northeast metropolitan domiciles where he must live in order to properly conduct his job for the long-term.

## Carlson Does Not Intend to Return to Florida When He Leaves

In *Palazzo* v. Corio, *232 F.3d* 38, 42 (2d Cir. 2000), "Domicile is 'the place where a person has his true fixed home and principal establishment, and to which, whenever he is absent, he <u>has the intention of returning</u>.'" To effect a change of domicile, "two things are indispensable: First, residence in a new domicil[e]; and, second, the <u>intention to remain there</u>." *Id*. (quoting *Sun Printing & Publ'g Ass'n v. Edwards*, 194 U.S. 377, 383 (1904)) (emphasis added).

The evidence obtained from the jurisdictional discovery shows that Carlson is a serial seasonal vacationer in Florida (i.e., a snowbird) and not a truly domiciled person. He bought a $2.9 million house on the vacation island of Gasparilla Island[1], which is located on the remote

---

[1] Carlson admits only to buying in Lee County, but news reports detail it further as Gasparilla Island: David M. "Tucker Carlson Sells D.C. Digs, Snags Florida Hideaway" Dirt.com website. July 16, 2020.

Southwest Gulf Coast of Florida in Lee County, on January 7, 2020. (Greer Decl. ¶ 16, Ex. 1).

This island has no road in some parts, with mansion accessible only by golf cart and boat, and

has a single bridge for cars connecting it to mainland Florida. It is where wealthy people seeking

privacy have second homes for the winter.

Carlson had rented a vacation house near this purchased house for 25-years. (Greer Decl.

¶ 17 Ex. 8). His pattern of use of these types of houses in Florida, he admits, has been for short-

term purposes.

> Carlson states, "In the autumn of 2019, I decided to make Florida a
> permanent home and purchased a residence, after 25 years of renting
> a residence in Florida. The purchase date for the Florida house,
> which is near the residence that I had been renting, was January 7,
> 2020, six months before this lawsuit was filed." *Id.*

Based on that evidence alone, a reasonable jury would assume first that Carlson is just a

vacationer in Florida until proven otherwise. What other evidence did he provide?

Carlson claims that he lived in in his newly bought Florida house from ████████████

██████████

> "Defendant resided in the Washington, DC house for a portion of January
> and February of 2020. Defendant acquired his domicile in Florida in
> January of 2020, ████████████████████████████████
> ████████████████████████████████████████
> ████████████████████████████████████████
> (emphasis added). (Greer Decl. ¶ 18 Ex. 9. (Carlson responses to first
> integratory ("First Rog"), Response 5))[2]

---

[2] Of note, this Florida purchase occurred after Carlson had moved from one house to another within the Washington,
DC area, presumably to evade violent protestors who were showing up at those domiciles, per news reports on
Carlson's own show. Public records show that Carlson sold his house at 5225 Partridge Lane NW, WASHINGTON,
DC in September of 2017, which is a different house from the one he sold in July of 2020. That second DC house,
recently sold, was placed under a trust company that shielded Carlson's identity as owner. Because Carlson objected
to questions as to why he made the strange move from DC to remote Florida, it cannot yet be proven that his intent
in moving to Florida was simply to seek refuge during dangerous times. Future deposition evidence would be
enlightening.

However, his credit card spending indicates that he spent considerable time away from

Florida ████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████    ▪

     Based on the redacted information, Plaintiff estimates that ████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████

     There is weak evidence indicating that Carlson seriously plans to return to his Florida

house full-time when he leaves it. To the contrary, the evidence detailed above shows that

Carlson promptly left Florida almost as soon as he bought the house and returned to his family-

owned house in Maine, as he does annually. "The Maine property has been in the family since

Defendant was a child, ██████████████████████████████ (Greer Decl. ¶ 18

Ex. 9. (Carlson reply to Rog 2)) Inside of that residential Maine house, ███████████████

█████████████████████ (*Id.* (Carlson reply to Rog 3)). He has possibly used it

prior to that as well, but the scope of jurisdictional discovery was limited to the year 2020.

     The evidence proves that Carlson has spent more time in Maine than he has in Florida

(from January through October), and almost half of his time in Maine ██████████████████

---

[3] Indicating that Carlson still desires to be around the culture of the big city rather than being isolated.

████████████████.[4] The preponderance of evidence shows that Carlson does not return to Florida on a full-time basis when he leaves. Instead, he bounces in and out of Florida like the wealthy man traveling incognito with multiple homes that he is.[5]

### Carlson's "Course of Conduct" Does Not Support Florida Domicile

To determine domicile, "[a] court must consider the entire course of a person's conduct in order to determine the relevant intent." *Korb v. Merrill Lynch, Pierce, Fenner & Smith, Inc*., No. 03-CV-10333 (CSH), 2006 WL 300477, at *1 (S.D.N.Y. Feb. 7, 2006) (emphasis added). However, there is little evidence to show that Carlson's "entire course of conduct" is consistent with a Florida domicile. He could provide no evidence of membership in churches, golf clubs, country clubs, etc. His only evidence of belonging to a club was that he paid dues to some sort of private beach club in Florida, per a decision by this Court (ECF 111).[6] He claims on TV to be an avid fisherman,[7] yet he has no Florida fishing license. This dearth of evidence supports Plaintiff's arguments against Florida as being Carlson's domicile.

Carlson did obtain a Florida driver's license in February of 2020 (Greer Decl. ¶ 20, Ex. 11), but that could well have been just a perfunctory step required by his human resources

---

[4] Carlson's return to Florida in October does not factor into the evidence of his domicile because it is the time if filing of the complaint that is the key date. *Chevalier v. USA Exp. Moving & Storage Inc*., No. 03-CV-09059 (PKL), 2004 WL 1207874, at *2 (S.D.N.Y. June 2, 2004)

[5] Of note, during this litigation process, Carlson has demanded unusual levels of privacy in the form of sealed court filings. He has also preemptively accused Plaintiff of potentially "doxing" him should Plaintiff be allowed to see his address, etc. Carlson is clearly behaving like a man living with anxiety from past experiences of protestors surrounding his houses in DC.

[6] This Court eventually concluded, after in-camera review and follow-up letters from Carlson, that the invoice documents provided were evidence of a club membership. However, because they were sealed from Plaintiff and the only the Court reviewed then in-camera, Plaintiff cannot refute these claims. For example, were these simply one-time payments to a private beach, which is just barely a "club"?

[7] Carlson has used the guise of a fishing trip as cover for when he has been suspended off the air by Fox News.

department at Fox News to avoid New York State income taxes, and to obtain car insurance. This driver's license is his strongest evidence to support the Florida domicile argument.[8]

Carlson claims that he will pay taxes in Florida. However, those payments had not yet occurred at the time of this case filing in July according to the documents provided. The highly redacted Florida house purchase documents show a settlement date of January 7 and taxes being paid to the county from January 1 though the 7th. However, those would have been paid by the previous owner. (Greer Decl. ¶ 16 Ex. 7)

Carlson cannot establish domicile based on evidence created after this case was filed. "A party's citizenship under 28 U.S.C. § 1332 depends on his domicile at the time the legal action is commenced." *Chevalier v. USA Exp. Moving & Storage Inc.*, No. 03-CV-09059 (PKL), 2004 WL 1207874, at *2 (S.D.N.Y. June 2, 2004) (citing *Linardos v. Fortuna*, 157 F.3d 945, 947-48 (2d Cir. 1998)); *see also Van Buskirk v. United Grp. of Companies, Inc*., 935 F.3d 49, 53 (2d Cir. 2019) ("For purposes of diversity jurisdiction, the relevant domicile is the parties' domicile at the time the complaint was filed." (citation omitted)).

Carlson claims that he voted in person in Florida this this year (Greer Decl. ¶ 18 Ex. 9 (Reply to Rog 12), but provided no date or location, and he provided no document, such as an "I voted" sticker or receipt, to prove that he actually voted. Nevertheless, assuming arguendo that he did vote in the Fall election, this evidence cannot be used to support his domicile argument since it occurred after this case was filed.

Carlson claims to have children, but then he stated that his children no longer live with him. (*Id.* Carlson reply to Rog 7), Therefore, he could provide no evidence of involvement with

---

[8] Carlson strongly objected to the simple questions about whether or not he also possesses driver's licenses in other states. If he did still hold such licenses it would be strong evidence against his Florida domicile argument.

schools or parenting in Florida. Also, he provided no evidence of his children ever visiting him in Florida.

Carlson's wife does live with him in Florida, according to a brief reply to interrogatory. (*Id.*) However, nothing is known about her time spent in Florida as compared to time spent in other Northeast locations.[9] A reasonable person would assume that Carlson would have volunteered such evidence during discovery if she were, for example, active in the Florida community as a full-time resident.

Carlson submitted to Plaintiff fully redacted documents as evidence of a "membership" to a beach club. However, after an in-camera review by this Court and a letter of explanation from Carlson, it was decided (ECF 111) that this these charges were one-time fees to visit a private beach; far from a true "club membership" in a church, golf club, or other types of evidence of community involvement. It is common for people genuinely domiciled in Florida to have memberships to retirement communities, golf clubs, yacht clubs, etc., as Plaintiff does. It is unusual for Carlson and his wife to lack memberships to these types of clubs after a full 12-months of supposedly living in Florida, and more evidence that Carlson is staying in Florida incognito.

Carlson claims to have medical insurance and doctors in Florida, but he provided no evidence other than his statement. (*Id.* (Reply to Rog 14)) Of note, Carlson underwent dermatologic surgery on his nose this year and yet he did not state where that took place. One would assume that he would have voluntarily proffered that as evidence if it had occurred in Florida.[10]

---

[9] This Court limited the scope of discovery so that these questions remain unanswered.
[10] Plaintiff's questions on this were stricken down by this Court.

Overall, Carlson's course of conduct is one of a man living part-time in a Florida vacation house. He has rented a house nearby in Florida in a similar manner for many years, he admits. Tucker Carlson was merely a Florida vacationer or refugee at the time this case was filed, a reasonable person could conclude.

## Carlson Has Not Abandoned His Northeast Domiciles

In *Pacho v. Enter. Rent-A-Car*, 510 F. Supp. 2d 331 (S.D.N.Y. 2007), the party opposing diversity jurisdiction 'bear[s] the burden of proving that [the initial domicile] had been abandoned for' some other domicile." *Id.* (quoting *Herrick*, 251 F.3d at 324). The evidence supports Plaintiff's argument that Carlson is only temporarily living in Florida due to the pandemic and hostile political environment.

A reasonable jury would likely find that it is untenable for Tucker Carlson to film one of the most viewed TV shows in the land from his living room. Plaintiff argues that Carlson cannot have truly abandoned his plans in the near future to be domiciled somewhere in Washington, DC, New York, or California.[11]

Carlson also fully admits that he has not abandoned Maine as his location for filming. He stated, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮ (Greer Decl. ¶ 21 Ex. 12, (Carlson reply to suppl. Rog 1)) Therefore, the Maine house, that "has been in the family" and where Carlson spent much of the year at the time of this case filing, certainly seems to be his true new domicile.[12]

---

[11] Carlson strongly objected to questions that sought details of his production plans, nature of his studio, how he planned to have guests on the set with him in his living room studio, etc. Why would a man with a proper long-term viable studio plan object to such discovery? That question remains for full discovery.

[12] It is unclear whether or not Carlson still possesses a Maine driver's license, or which, if any, clubs in Maine to which Carlson belongs, etc. due to the limited scope of jurisdictional discovery.

## __The Totality of Evidence is Against Carlson Domiciled in Florida__

Carlson's course of conduct, discussed above, is inconsistent with a man who has truly abandoned his domicile in Maine or near a large city where television shows can be properly produced. His choice of house location in remote Florida is not where one would expect him to have moved if he were truly abandoning the big-city life. Perhaps Orlando or Miami might have been viable locations for his new studios, but not Gasparilla Island in Lee County, Florida.

Evidence in support of Carlson being domiciled in Florida is that he did purchase a Florida house in January of 2020 and sold his Washington, DC house just one week before this case was filed. He also obtained a Florida driver's license.

On the other hand, evidence in support of Carlson being now domiciled in Maine is that, A) ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ and C) the house in Maine is owned somehow by the Carlson family and has been his destination for many years, and D) news reports support that Carlson is a member of the Maine community, whereas there is nothing in the news to support him being part of the Florida community, and E) Carlson films his TV show from Maine and admits that he will continue to do so, F) Carlson has not joined any clubs in Florida other than for beach-access, G) ██████████████████ ██████████████████████████████ F) it defies common sense that Carlson can continue to film his show from his living room or garage in Florida.

So, why did Carlson make the move to Florida? He refused to answer that simple question, leaving Plaintiff to speculate.

Florida is a conservative state run by a Republican governor who shares similar political views as Carlson's TV persona. Florida also does not have any statewide pandemic lockdown

orders, mask mandates, or state income tax. Therefore, it is quite possible that Carlson made the move to Florida merely as a temporary safe haven maneuver during the pandemic and times of violent activism. [13] Under normal circumstances, it would be unprecedented for someone with a national TV show to make such a move. However, the current work-from-home environment has caused many cable TV show hosts to film from home or remote studios in a temporary basis.

## Jennifer Strasburg is Not Domiciled Abroad

 The second argument that the Defendants' use for their MTD is that Jennifer Strasburg is now domiciled outside of the United States in London, U.K. Therefore, Defendants' argue that due to domicile case law[14] Plaintiff's claim of diversity subject matter jurisdiction should fail again. However, the evidence shows that Strasburg has not met the high standards and criteria set by case law for being domiciled abroad.

In this Court's previous order (ECF 86), "It is now incumbent on Strasberg to prove that she "abandoned" her initial domicile in the United States for a domicile in the United Kingdom. See *Pacho*, 510 F. Supp. 2d at 335.

The central question with respect to Strasberg is whether she intends to "remain" in the United Kingdom or return to the United States. *See Palazzo*, 232 F.3d at 42. It is not uncommon for U.S. citizens who are living abroad to intend to return to the United States. *See*, *e.g.*, *Seales v. Panamanian Aviation Co.*, No. 07-CV-02901 (CPS) (CLP), 2009 WL 395821, at *7 (E.D.N.Y. Feb. 18, 2009) (plaintiff denied he intended to make foreign country his "permanent home" and

---

[13] Chiu A. "'They were threatening me and my family': Tucker Carlson's home targeted by protesters" Washington Post website. November 8, 2018
[14] *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 68 (2d Cir. 1990)

stated "he always intended to return to the United States"), *aff'd*, 356 F. App'x 461 (2d Cir. 2009)." (emphasis added).

## **Strasburg Has Not Abandoned United States Domicile**

Per the *Palazzo* point that it is not uncommon to live abroad, Strasburg is one of the millions of Americans[15] living abroad for work and has not abandoned her U.S. domicile. News Corp and The Wall Street Journal, the various companies for which she works, have assigned her, along with others, to work from their London offices. (Greer Decl. ¶ 22, Ex. 13 (Strasburg response to Rog 2)) But Strasburg has not met the standards, as defined by *Pacho,* to be considered as domiciled abroad.

It is incumbent on Strasburg to prove that she has abandoned her U.S. domicile. (ECF 86) However, her course of behavior is inconsistent with that.

Strasburg still owns a house in Brooklyn, New York. ████████████████████
██████████ She travels back to the U.S. frequently. She still votes in the U.S., holds a U.S. driver's license and passport, and pays U.S. taxes. Also, Strasburg has not told anyone that she plans to abandon her domicile.

In Strasburg's declaration (ECF 49), she affirms that she is domiciled in the United Kingdom, but that declaratory statement is allowed to be challenged by jurisdictional discovery. Moreover, she fails to declare that she has abandoned her U.S. domicile.

## **Strasburg's Behavior Has Been One of an American-Domiciled Person**

Strasburg's course of behavior has been more like someone who has been living in the U.S. rather than abroad in the U.K. First, she still owns a house in Brooklyn, New York. (Id.

---

[15] No author listed. "The American Diaspora" Esquire website. September 26, 2008

(Strasburg response to Rog 1)). Her primary assets and investments seem to be in the U.S. in the form of this house. She stated that she still owns the U.S. house because it is a "good investment". (*Id.* Rog 6) She pays U.S. taxes. (*Id.* Rog 14) ███████████████████████████

(*Id.* Rog 8)

      Secondly, Strasburg's family is still in the U.S. ████████████████████████████

███████████████ (*Id*. Rog 3,4) She moved to the U.K. only for her job. (*Id.* Rog 2)

      Thirdly, Strasburg frequently returns to the U.S. each year. Even in 2020 with pandemic restrictions on travel, she had made the trip across the pond twice (Travel will be detailed in the next section.).

      Fourthly, Strasburg still possesses an active U.S. driver's license and passport. (*Id.* Rog 9) She also votes in U.S. elections still. (*Id.* Rog 10)

      Fifthly, Strasburg has never told anyone that she plans to abandon her U.S. domicile. (*Id.* Rog 11) None of her coworkers have plans to abandon their U.S. domicile either. (*Id.* Rog 12)

## **Strasburg Intends to Return to Her United States Domicile**

      In *Palazzo* and *Seales*, the intent to return to the U.S. is a key determinant in whether or not the person is truly domiciled abroad. The evidence shows a clear pattern of frequent return trips by Strasburg.

      Since moving to London seven years ago, Strasburg has returned to the U.S. about six times each year. Even in the year 2020, during the tight travel restrictions caused by the pandemic, she has made it back to the U.S. twice so far, and that was before the holidays. (*Id.* Rog 7)

      Strasburg admits that she moved to London because of her job at the Wall Street Journal. Her assignment abroad is far from a permanent career change. Even her employment in

journalism is tenuous in these days of failing print publications. Should her job status change, there is no evidence proffered that she would stay abroad.

Strasburg's extensive travels back to the U.S. to see her family, retention of ownership in a house, and so on all indicate that she intends to return to the U.S. at some point. Also, in Strasburg's declaration (ECF 49), she fails to state that she does not intend to return to the U.S. as domicile.

## **Strasburg's Assignment Abroad is Common for U.S. Domiciled People**

In *Seales*, the plaintiff was trying to prove that he intended to return to the U.S. from Jamaica and had not abandoned his U.S. domicile, which is the opposite of what Strasburg contends here. In *Seales*, the judge's rationale and use of evidence refutes Strasburg's arguments in this case.

In *Seales*, "It is not uncommon for U.S. citizens who are living abroad to intend to return to the United States." That is true here with Strasburg. Her employer alone has numerous Americans stationed abroad.

Then, the court in *Seales* ruled that the plaintiff was still U.S. domiciled because he held a passport for his child, traveled back to the U.S., albeit briefly, and held a bank account in the U.S. In this case, so too has Strasburg traveled often to the U.S., possesses U.S. IDs, and has a U.S. bank account.

However, in *Seales*, evidence against the plaintiff having a U.S. domicile was the plaintiff's lack of voting in the U.S. and his expired driver's license. But in this case, Strasburg does still vote in U.S. elections and still has a current U.S. driver's license.

In totality, the evidence to support that Strasburg is still a U.S. domiciled person is greater than that for the plaintiff in *Seales* and that court still ruled in favor of the plaintiff

seeking U.S. domicile in *Seales*. Therefore, the argument for Strasburg being U.S. domiciled is even stronger.

In summary, it is common in litigation for parties to argue that they are not U.S. domiciled in order to evade justice. Therefore, the case law over the years has made it a high hurdle for one to prove that they are not a U.S. domiciled person if they are still a U.S. citizen working for a U.S. company assigned abroad. For the reasons and evidence stated above, Strasburg is clearly a U.S. domiciled person.

## Plaintiff is Domiciled in Florida

The third argument used by Defendants for their MTD is that Plaintiff failed to properly plead he is domiciled in Florida. In fact, Plaintiff is domiciled in Florida based on the same case law criteria set out above.

### Plaintiff Plans to Return to Florida When He Leaves

Per *Palazzo*, the intention of returning is a key component to determine domicile. Since moving to Florida in May of 2019, Plaintiff has left the state briefly only three times. Each trip was approximately a week long and for the purposes of either vacation or business.

In October of 2019, Plaintiff took a vacation to Los Angeles to see The Who at the Hollywood Bowl, then drove to Palm Springs to golf at La Quinta, then flew back from Los Angeles. In March of 2020, Plaintiff traveled to New York City for oral arguments in his federal case before the Second Circuit. Then, in November of 2020, Plaintiff took a vacation to the Sonoran Desert in Arizona for a week. He stayed at The Boulders Resort in Carefree, Arizona. (Greer Decl. ¶ 4) In all cases, Plaintiff promptly returned full-time to Florida, unlike Carlson's ███████████████████████████████████████.

## Plaintiff's "Course of Conduct" Supports Florida Domicile

Per *Korb*, to determine domicile, "[a] court must consider the entire course of a person's conduct in order to determine the relevant intent." While Carlson and Strasburg's courses of behavior do not support their domicile arguments, Plaintiff's course of behavior does support his Florida domicile argument.

First, Plaintiff moved to Florida for a plausible reason: To play more golf and to build a Florida wound care practice that focuses on elderly. This is in stark contrast to Carlson's lack of plausible reason for moving to Florida.

Plaintiff discovered Port Saint Lucie when he traveled from Ohio in 2019 to receive golf lessons from the world-renowned instructors of the Butch Harmon Floridian academy (i.e., coaches to the top golfers, such as Dustin Johnson, Jon Rahm, and Brooks Koepka). He also received instruction from Warren Bottke at PGA National (i.e., coached Brooks Koepka). (Greer Decl. ¶ 6)

Plaintiff resides in a three-bedroom single-family house located within the PGA Village of Port Saint Lucie. He has been there since May of 2019. (*Id.* ¶ 2) It is the same address as the one used to file this complaint. In contrast, Carlson is living in hiding like a refugee, refusing to reveal even his basic address to his mystery house.

Plaintiff is heavily involved in the community in Port Saint Lucie, Florida, unlike Carlson. Plaintiff has formed club memberships with The Legacy golf club (*Id.* ¶ 6 Ex. 4) as well as Hammock Creek Golf Club in Palm City. (*Id.* Ex. 3) Plaintiff also purchased upfront a yearlong membership to the LA Fitness Club in Port Saint Lucie. (*Id.* Ex. 2)

Plaintiff also made a formal bid to purchase the 38-acre PGA Learning Center. (*Id*. ¶ 8) After discovering duplicitous intentions by the PGA, he helped a reporter at the largest

newspaper in the region cover the scandal. (*Id.* ¶ 9)[16] In doing so, Plaintiff became acquainted with the leaders of Saint Lucie County. (*Id.* ¶ 10)

Plaintiff obtained his Florida medical license promptly after moving to Florida, which is no small task. (Id. ¶ 7 Ex. 5) It requires an extensive application process, FBI background checks, etc. Plaintiff plans to start a clinic in Florida.

Plaintiff's travel pattern, detailed above, is one of rarely leaving Florida. This is in stark contrast to Carlson's pattern. Plaintiff lives in Florida throughout the unbearably hot months, unlike the snow-bird vacationer Carlson.

Plaintiff voted in-person in the 2020 November elections. (Id. ¶ 5 Ex. 1). Plaintiff has received routine medical care at the Cleveland Clinic campus near Miami (*Id.* ¶ 11 Ex. 6) and dental care from an office in Palm Beach Gardens. (Id. ¶ 12) Plaintiff has no issue with detailing this, in contrast to Carlson who strongly opposed these simple discovery facts.

Plaintiff uses a local bank branch in Port Saint Lucie that is part of a national corporation. (Id. ¶ 13)

Plaintiff has extensively studied over two-years the wildlife in South Florida using motion-activated cameras. He has become acquainted with Florida bobcats, raccoons, bald eagles, osprey, armadillo, rabbits, pythons, lizards, etc. (Id ¶ 14)

In summary, the evidence on Plaintiff's course of conduct proves that plaintiff is a Florida resident and domiciled in Florida. It also exposes the lack of evidence proffered by Carlson, in comparison.

---

[16] Dolch C. "PGA Learning Center sale marks the sad end of a golf gem in Port St. Lucie" TCPalm newspaper website. June 30, 2020

## **Plaintiff Has Abandoned New York Domicile**

Per *Pacho*, whether a party has abandoned their former domicile is a key factor in determining whether or not a new domicile can be established. Plaintiff has abandoned Ohio and New York domiciles.

Plaintiff abandoned Ohio domicile in 1996 after graduating from medical school. In 1997, he began his 19-years of New York domicile. In 2016, he left New York and returned to Ohio before moving to Florida in 2019. (Id. ¶ 15) Plaintiff is attempting to become a good golfer and seeks a better climate than Ohio. Also, the high-end concierge medical business was not in demand as much in Ohio as other states. Therefore, Plaintiff abandoned Ohio for Florida. (Id. ¶ 15)

Regarding New York, Plaintiff closed his concierge medical business in New York and has no plans to reopen a physical office. Any medical and wellness care that someone outside of Florida might seek from Plaintiff can be delivered by the newly approved telemedicine procedures made possible by the pandemic policy changes from Medicare (CMS).

Plaintiff also no longer works with New York media companies, such as Fox News and News Corp. He has been interviewed by New York radio stations and podcasts many times in 2020, which has not required him to leave Florida.[17]

Plaintiff has no intentions of returning to New York for domicile. He regrets not leaving New York sooner than he did. The current uninhabitable condition of New York caused by the governments in charge has made it unthinkable for Plaintiff to return.

---

[17] "Press Coverage of Steven Greer" GreerJournal.com. https://greerjournal.com/test-2/

In summary, Plaintiff is clearly domiciled in Florida. He returns full-time when briefly and occasionally leaving the state, unlike Carlson. His course of conduct satisfies the case law criteria, unlike Carlson, and he has abandoned his previous domiciles, unlike Carlson.

## This Court Has Authority to Sever Non-Essential Parties

Should this Court somehow disagree with the arguments set forth by Plaintiff, it has the authority to sever Carlson and Strasburg as non-essential parties to preserve the case. "Federal Rule of Civil Procedure 21 gives a district judge discretion to dismiss parties that are non-essential under Rule 19. Fed. R. Civ. P. 21 ("On motion or on its own, the court may at any time, on just terms, add or drop a party."); *Grupo Dataflux v. Atlas Global Grp., L.P.*, 541 U.S. 567, 582 (2004) (citation and internal quotation marks omitted) ("[I]t is well settled that Rule 21 invests district courts with authority to allow a dispensable nondiverse party to be dropped at any time, even after judgment has been rendered.").[18]

Therefore, this MTD should be limited in scope to Carlson and Strasburg, if this Court so concludes that it lacks jurisdiction, without disturbing the main case at bar against the other parties. While each individual is very much culpable and deserving of this complaint, Plaintiff could still receive partial justice by prevailing over their employers.

## Summary

Defendants have engaged in classic corporate-defense legal strategy of arguing every minutia, starting with the process of service. This MTD was borderline frivolous.

---

[18] Basil M, *et al* for the law firm of Jenner & Block. "Practice Series: Federal Subject Matter Jurisdiction Outline" Jenner.com. page 23. 2011

They argue that Tucker Carlson, the star of a national TV program that requires intense production support from large cities, has actually moved to a remote part of Florida to make it his new domicile, despite spending most of his time in Maine after leaving DC. It is an implausible ruse meant to mislead this court.

Likewise, Jennifer Strasburg failed to prove that she has abandoned her American domicile status. She extensively returns to the U.S., owns a house in the U.S., has no family in London, votes in the U.S., pays taxes in the U.S., and admits to moving to London for her job duties.

In contrast, Plaintiff has ample evidence to prove that he is domiciled in Florida. He is a Florida-licensed MD with many affiliations and activities in Florida.

For those reasons, this MTD should be dismissed. Plaintiff also recognizes this Court for its exceptionally timely and thorough work to date on this case.

## Compliance

This motion response complies with FRCP Rule 27 and is under 5,200 words. There are no local or individual rules to supersede.

Signed this 13th day of December, 2020

*Steven Greer*

Steven Greer
7029 Maidstone Drive
Port Saint Lucie, Florida 34986
(212) 945-7252
Steve@GreerJournal.com